**UNIVERSAL CITY STUDIOS, INC., Plaintiff,**

v.

**NINTENDO CO. LTD. and Nintendo of America, Inc., Defendants.**

**No. 82 Civ. 4259 (RWS).**

United States District Court, S.D. New York.

July 29, 1985.

---

Townley & Updike, New York City, for plaintiff; Douglas C. Fairhurst, Mary D. Faucher, Lawrence C. Fox, New York City, of counsel.

Mudge Rose Guthrie Alexander & Ferdon, New York City, Sax & Maciver, Seattle, Wash., for defendants; John J. Kirby, Jr., Thomas G. Gallatin, Jr., Shelley B. O'Neill, Catherine E. Palmer, Robert J. Gunther, Jr., New York City, of counsel.

## OPINION

SWEET, District Judge.

From the outset, this case has involved two gorillas, King Kong and Donkey Kong, and the rights of their respective owners, plaintiff Universal City Studios, Inc. ("Universal"), and defendants Nintendo Co. Ltd. and Nintendo of America, Inc. (collectively "Nintendo"). Universal initially sought to enjoin Nintendo from selling its Donkey Kong electronic arcade game, claiming that the game infringed Universal's rights in King Kong. With that issue resolved in favor of Nintendo by way of summary judgment, what remain are Nintendo's counterclaims, which seek damages arising out of Universal's conduct. Universal views its conduct as the good faith assertion of rights not yet determined at the time of the events in question. Nintendo asserts that Universal misappropriated Nintendo's Donkey Kong property and was thereby unjustly enriched, that Universal tortiously interferred with Nintendo contracts and Nintendo's licensing program,

and that Universal vicariously infringed Nintendo's copyrights. Based on the facts and conclusions stated below, Nintendo is entitled to judgment, costs, and damages, both actual and exemplary.

Counsel for both parties were learned, highly skilled and enjoyable advocates who agreed on at least one critical element: it was for the court to view this voluminous record and the seven days of testimony in this bench trial to determine the credibility of the witnesses and the attendant facts which will control the theories and authorities to be applied. In order to accomplish the task, it is necessary to consider the framework of the issues, the prior proceedings, the participants in the transactions at issue, the knowledge and intent of the participants as the events occurred, and the rights involved. The facts so determined must be applied to Nintendo's counterclaims of unjust enrichment, tortious interference with contract, and vicarious infringement of copyright. What must be delineated is the boundary between the aggressive but legitimate assertion of questionable rights in intellectual property and the reckless disregard of the rights of others.

### The Issues

Universal in the fall of 1981 had certain rights to King Kong that derived from prior litigation and its settlement. These were viewed by Universal as merchandising rights with certain acknowledged limitations, in particular the inability to replicate any of the images of King Kong contained in the 1933 and 1976 King Kong movies. There was no active program to capitalize on these rights or to protect them.

Also in 1981, Nintendo started selling its Donkey Kong electronic arcade game, first in Japan, where it was developed, and then in the United States. In the fall of 1981, Tiger Electronic Toys, Inc. ("Tiger") sought a license to use the name King Kong in connection with its electronic game, and thereafter the officers of Universal began to focus on Donkey Kong and its success as an arcade game.

By April of 1982, the Donkey Kong arcade game had reached the notice of Universal's top executives, who then were considering a relationship with Coleco Industries, Inc. ("Coleco"), a toy maker, either by way of an investment or a joint venture. Aware of Coleco's intent to produce a home video cartridge version of Donkey Kong under license from Nintendo, Universal's representative at a meeting with Coleco for the first time voiced the claim that Donkey Kong violated Universal's rights in King Kong. The following day telexes were sent to Coleco and Nintendo asserting Universal's rights. Universal made or sought no formal opinions or writings clarifying its rights. Coleco was on the threshold of entering the market place with its fully developed Donkey Kong game, and in an exercise of business judgment, Coleco capitulated to Universal's demand and entered into an agreement to pay to Universal 3% of its gross revenues from the sale of Donkey Kong cartridges in exchange for a covenant by Universal not to sue.

After two meetings with Universal representatives, Nintendo declined to make any concessions to Universal. In the course of these meetings, Universal's representative stated that Universal's litigation had been a profit center for the company and that Nintendo should start saving its money for legal fees. On June 6 this action was commenced with accompanying press releases.

Thereafter Universal successfully convinced two other Nintendo licensees to enter into Coleco-like agreements. From these agreements, Universal has received to date $4,765,371.48. In January 1983, having received a list of Nintendo's licensees in discovery, Universal's counsel wrote to the licensees, threatening litigation if agreements with Universal were not reached. As a consequence of these letters, Nintendo lost $94,219.41 in guaranteed royalties due under certain of its license agreements.

Nintendo, in the course of this litigation has incurred substantial legal fees and now seeks damages on its counterclaims for the (1) misappropriation of its rights in Donkey

Kong and Universal's consequent unjust enrichment arising out of its agreements with Nintendo's licensees, (2) vicarious copyright infringement by Universal arising out of the distribution of the Tiger/King Kong home video cartridge, and (3) tortious interference with Nintendo licenses. Universal has moved to dismiss these claims on legal and factual grounds.

Universal's rights, merchandising or otherwise, Universal's intent and knowledge in asserting those rights, and the consequences which flowed from Universal's acts must be determined.

### Prior Proceedings

Universal is, and has been, no stranger to the courts. Its rights in King Kong resulted from agreements arising out of litigation commenced by Universal in 1975 to challenge the rights of RKO Radio Pictures, Inc. ("RKO") in its 1933 movie *King Kong* and its grant to the Dino DiLaurentiis Corporation ("DDL") to remake the movie (the California litigation). Universal successfully sought to establish that the King Kong story was in the public domain. Involved also were the rights of Richard Cooper, the heir of Marian C. Cooper, the author of the King Kong story which first appeared in print in 1932. The California litigation was ultimately resolved by way of settlement and judgments entered in that litigation, as found in this court's opinion reported at 578 F.Supp. 911 (S.D.N.Y. 1983) (the earlier opinion).

In the earlier opinion on cross motions for summary judgment, Nintendo's defenses to Universal's claims of infringement were upheld, and the complaint was dismissed on the overall holding that Nintendo had violated no Universal rights. The grant of summary judgment was upheld on appeal on the ground that there was no likelihood of confusion between Donkey Kong and King Kong. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112 (2d Cir.1984). Nothing in the record to date has altered any of the findings and conclusions previously stated, and they are adopted and incorporated as part of the instant findings and conclusions.

Thereafter, the parties continued their discovery on the unresolved Nintendo counterclaims and from May 20 to 28 presented evidence in a bench trial. It is upon that evidence, including the depositions and exhibits as well as the facts previously found in the earlier opinion, that the following facts and conclusions are based.

### The Participants

Because of the recurrence of such emotionally and legally charged concepts as bad faith, tortious interference, and vicarious infringement, it is necessary to examine not only the parties' corporate identities, but also the knowledge and intent of certain of their officers during the events which took place from the fall of 1981 through 1983. Because corporate knowledge and intent is a mosaic made up of smaller bits and pieces of motivation held by various Universal officers and employees, from its Chief Operating Officer to its Divisional Officers, as well as its lawyers, in house and outside, for convenience and hopefully clarity the parties will be described and the participants will be listed alphabetically, with their principal role in the transactions at issue summarized.

Nintendo Co., Ltd. is a corporation organized under Japanese law and founded in 1889, with its principal place of business in Kyoto, Japan, and branches in five other Japanese cities. It is engaged in the manufacture, assembly and sale of video arcade games, hand held games, playing cards, mah-jong games, tuggle board games and amusement arcade games. Nintendo of America, Inc. is a corporation organized under the laws of the State of Washington in 1981, with its principal place of business in Redmond, Washington. Nintendo of America, Inc. is engaged in the importation, assembly, manufacture and sale of video arcade games and table top games, as well as the importation of hand held video games. During its fiscal year ending September 30, 1981, the sales of Nintendo of America, Inc. were approximately $4.7 million and its net revenues were approximately $64,000. For fiscal 1982 Nintendo

had sales of $111 million and net revenues of $22 million.

Universal is a wholly owned subsidiary of MCA, Inc. having its principal place of business at 100 Universal City Plaza, Los Angeles, California. It is engaged generally, through its "Universal Pictures" division, in the business of producing and distributing motion pictures in the United States and throughout the world. Its corporate affiliate, Merchandising Corporation of America, Inc. ("Merchandising"), is in the business of licensing various Universal trademarks and characters for use by others in connection with the sale of merchandise and services. In 1984, MCA's net income was $95 million, and sales were $1.6 billion.

*Steve Adler* ("Adler") is a former vice president of MCA, Inc. and was involved in licensing Universal's rights in King Kong to Tiger Electronics.

*Minora Arakawa* is president of Nintendo of America.

*Ben Cooper, Inc.* is a manufacturer of King Kong Halloween masks under license from Universal.

*Coleco Industries, Inc.* ("Coleco") is a medium size toy company based in Hartford, Connecticut that obtained a license from Nintendo in November 1981 to produce a Donkey Kong videogame cartridge for its home video system, Coleco-Vision. Universal in April 1982 was interested in investing in Coleco, possibly entering into joint undertakings, and in negotiating fees as royalties based on Universal's King Kong claims.

*Joseph Di Muro* ("Di Muro") is a lawyer, the former general counsel of Universal. He retired in April, 1977 and has since served on a daily basis as a consultant. He maintains an office at Universal, is consulted by senior management, supervised the California litigation and is regarded as the most knowledgeable person at Universal concerning its King Kong rights. He has had thirty-five years of experience in the movie industry.

*Donkey Kong* is an electronic video arcade game developed by Nintendo in 1981 and sold successfully in the United States. It portrays a woman, captured by an ape and held captive at the top of a building. Mario the carpenter, operated by the game player, seeks to reach the maiden by negotiating a series of chutes and ladders, dodging obstacles and acquiring prizes. The game is made up of game boards of ascending difficulty to operate.

*Arnold Greenberg* ("Greenberg") is president of Coleco, which was founded by his father.

*Robert D. Hadl* ("Hadl") is a lawyer with experience in the Copyright Office and at the Federal Communication Commission and is vice president of Universal. He was formerly in charge of legislative matters for Universal and in the spring of 1982 he had, among other things, general responsibility for controlling outside litigation costs. He rendered advice in connection with the discussions with Nintendo and the initiation of this litigation.

*King Kong* is an ape, the subject of a serial and book by Marian Cooper which became the subject of a well-known movie *King Kong* in 1933. For the few who may not know because of youth, or reclusion, the movie at its climax portrays the giant ape astride the Empire State Building, holding the heroine captive, while the hero seeks to achieve her rescue. The story and many of the scenes in the 1933 movie were repeated in the 1976 remake.

*Steven Kroft* ("Kroft") is a lawyer, a member of the firm of Rosenfeld, Meyer & Sussman. He was responsible for conducting the California litigation and conferred with Hadl about Donkey Kong. He did not testify, either at the trial or by deposition.

*Howard C. Lincoln* ("Lincoln") is a lawyer, formerly a partner of Sax and Macivor, Nintendo's counsel. He was responsible for the incorporation of Nintendo of America, Inc. and is now its senior vice president and general counsel.

*O.R. Rissman* ("Rissman") is president of Tiger.

*Michael S. Schwefel* ("Schwefel") is a lawyer and senior vice president and general counsel of Coleco. He participated in the meetings with Universal and Nintendo in April and May 1982.

*Sidney Jay Sheinberg* ("Sheinberg") is a lawyer and President and Chief Operating Officer of MCA and Universal. He participated in the California litigation and was the principal Universal executive involved in setting Universal's policy toward Nintendo and its licensees. Sheinberg is the Willie Keith of this story: "the event turned on his personality as the massive door of a vault turns on a small jewel bearing." (Caine Mutiny, p.i). He acknowledged that the issues surrounding King Kong have had a special attraction for him. As he stated, "The King Kong case was my case and I was involved with it. I don't remember there being an intermediary. It had been said with some jest in Hollywood on my tombstone the two words that will go on are King Kong and Sony. Maybe they will add a third." Sheinberg's performance, naturally, is close linked to Universal's, since of his over $4.5 million salary in 1984, $4 million consisted of vested Universal stock rights.

*Laura Sifuentes* ("Sifuentes") is a lawyer and was a vice president of MCA, involved in licensing, including King Kong. She was discharged by Universal in August of 1982 as a result of events unrelated to Nintendo.

*Tiger Electronics Toys, Inc.,* ("Tiger") is a toy manufacturer which obtained a King Kong license from Universal.

### The Events

After the California litigation had been completed with the results described in the earlier opinion, Universal was uncertain as to its course of conduct with respect to its rights in King Kong. As a consequence of its success with the movie *Jaws* and its attendant licensing program, it was acutely aware of the value of merchandising rights, a term well understood in Hollywood if not elsewhere. Some defined merchandising rights as those rights which are derived from a particular work and have commercial value through the grant of the use of a name or symbol or picture on a tee shirt or some other artifact, and Sheinberg on June 18, 1980 requested Di Muro's advice on the subject.

DiMuro in turn consulted Kroft and then advised Sheinberg that Universal had "all 'King Kong' merchandising rights," without further defining those rights. Although RKO did not challenge Universal's right to "merchandise" King Kong, it insisted that no graphics from the 1933 picture could be used without its permission. It was also recognized that DDL's permission would be required to use pictures from the 1976 remake. By the fall of 1981, the only exercise by Universal of its merchandising rights in King Kong was the continuation of a prior license granted to Ben Cooper, Inc., relating to the manufacture and sale of King Kong masks and costumes.

The Donkey Kong video arcade game was developed by Nintendo in March, 1981. Nintendo conducted a trademark search of the name "Donkey Kong" in Japan, which indicated that the name was available for use and obtained a Japanese trademark registration for the name Donkey Kong. In June, 1981, Nintendo of America, Inc. conducted a trademark search of the name "Donkey Kong" in the United States and determined that the name could be registered as a trademark in the United States. On July 30, 1981, Nintendo of America, Inc. obtained United States Copyright Registration No. PA 115–040 for its Donkey Kong audio-visual work.

In the summer of 1981, Rissmann of Tiger travelled to Japan. While in Tokyo, he saw Nintendo's Donkey Kong video arcade game and decided that Tiger should produce a video game similar to Donkey Kong. In August 1981 Tiger sent a letter to Universal requesting a King Kong license for video games and handheld electronic games. Tiger requested that the license agreement be consummated "as speedily as possible." Universal executed an exclusive license with Tiger in September 1981 which provided that Tiger could

use King Kong in connection with handheld and tabletop electronic games and home video cartridges.

Sifuentes regularly conducted a trademark search when entering into a license agreement, and on September 25, 1981 she received the results of a trademark search report on King Kong. This report revealed numerous third-party trademark registrations of the King Kong name often in conjunction with a picture of a gorilla. Universal's merchandising and law departments decided not to take any action against those listed in the report because there was very little activity in licensing King Kong at Universal. Di Muro was consulted by Sifuentes in connection with obtaining stills from the 1933 King Kong movie from RKO for use by Tiger in connection with the granting of the Tiger license. Sifuentes at the time was unaware of Donkey Kong, and Tiger explained its interest as just an interest in old movies.

By October 1981, 4,000 Donkey Kong arcade games were being sold a month. In November 1981, Coleco reached an oral agreement with Nintendo to use Nintendo's Donkey Kong name and characters in connection with video game cartridges and electronic tabletop games. Coleco began promoting its Donkey Kong video game cartridges immediately after it reached this oral agreement and announced that the Donkey Kong cartridge would be featured as part of its new Coleco-vision system. Coleco received substantial advance orders for its Coleco-vision system featuring the Donkey Kong cartridge during the first four months of 1982. Coleco's formal license from Nintendo was signed on February 1, 1982, and provided for payment of a fixed sum and additional royalties of $1.40 for each Donkey Kong video cartridge sold and $1.00 for each tabletop game sold. The agreement also required that Coleco would not "do or cause to be done any act or thing contesting or in anyway impairing or tending to impair Nintendo's rights in its trademark 'Donkey Kong.'"

In December 1981 Sifuentes, in connection with a token use application, affixed "King Kong" on another manufacturer's unrelated game which contained no depiction of a King Kong character and sold the game to Universal Tours, and in January, 1982 Universal received the results of a King Kong trademark search which revealed Nintendo's pending Donkey Kong application. Sifuentes discussed the pending Donkey Kong application with Adler, another vice president of merchandising, and together they went to an arcade to play the game. After analyzing the game play, Sifuentes and Adler concluded that no one was really interested in licensing King Kong and that Tiger probably planned to use its King Kong license merely to copy Donkey Kong. They discussed whether they should continue offering licenses for King Kong. No action was discussed or taken to challenge the Donkey Kong application.

In February 1982, Dunbar Electronics ("Dunbar") contacted Universal and expressed an interest in licensing King Kong for watches and handheld electronic games. Adler and Sifuentes agreed to meet with Dunbar at the Toy Fair later that month. At the meeting, the Dunbar representative proffered his own trademark search report listing Nintendo as the owner of Donkey Kong and inquired about Universal's position with respect to Nintendo's product. Subsequently, in late February or early March, after the Toy Fair in February and conversations with officers of Dunbar, Sifuentes had "a long conversation" with Di Muro concerning Universal's trademark and copyright rights in King Kong and what rights in King Kong Universal could license. During this discussion, it was decided that Universal should cease licensing King Kong because it had no rights in King Kong to license and that it should terminate its two King Kong licensees, Ben Cooper, Inc. and Tiger, and refuse to grant a license to Dunbar. Sifuentes described the meeting with Di Muro as follows:

> Generally, we discussed the rights of Universal as they emanated from the various aspects of the lawsuit with RKO and Paramount. And we discussed li-

censing and what it entailed; we discussed trademark and copyright rights as it related both to licensing and to the lawsuit; and we discussed the various "King Kong" movies and the grant by the, I think, original owner, of the right to Universal. And after a long conversation, we decided that we (Universal/MCA) didn't have any rights in King Kong to license.

No record was made of this conference, but no action was taken in response to Dunbar's inquiry concerning Donkey Kong's rights. The Tiger license was cancelled as recounted below, the Ben Cooper license expired, and King Kong was removed from the list of Universal properties to be licensed.

Di Muro denied this conversation, but Sifuentes' testimony, albeit by deposition, is credible and consistent with both previous and subsequent events. It is also consistent with Di Muro's overall conservative approach and advice. Di Muro was a credible, consistent witness in the large, but even "Homer sometimes sleeps." *Don Juan*, Lord Byron, Chapter 3, St. 98. There was no affirmative action taken after the meeting; no document was prepared in connection with the conversation or subsequent to it. The event was transitory and advisory in nature, and its significance is evident only in retrospect. Aside from the suggestion that Sifuentes is a disgruntled employee, there is no reason for her to have created the conversation which was of some importance to her in accomplishing her job, but of far less significance to Di Muro. The disgruntled employee explanation is countered by Sifuentes' invocation of the attorney/client privilege on the occasion of her first deposition and by a review of her entire deposition testimony, which regrettably is all that is available to test her credibility. However, the task is not unknown to the factfinder. *See In Re Air Crash Disaster, Etc.*, 635 F.2d 67, 73 (2d Cir.1980); *Devitt and Blackmar*, § 73.02.

In April 1982, Sheinberg sought advice from DiMuro concerning Universal's, and presumably Sheinberg's, plan to produce their own King Kong movie. In a memorandum dated April 8, 1982, DiMuro advised Sheinberg that "RKO owns ... the visual representation of the King Kong ape" and instructed that "Universal's ape must be designed as an independent, original creation, without reference to stills or other reproductions of RKO's ape or De-Laurentiis' ape."

By the spring of 1982, Donkey Kong had become one of the most popular video arcade games, second only to Pac-Man. In April 1982 Sheinberg sent Hadl a copy of a "snippit" from a trade publication relating to Donkey Kong. This document was not further identified, but it is a reasonable inference that it reported on Donkey Kong's success. Sheinberg's King Kong nerve was again touched, and he asked Hadl to look into Donkey Kong and to determine whether it violated rights of Universal.

Hadl took his children to play the game and testified at trial that he believed Donkey Kong was substantially similar to the King Kong movie and reported back to Sheinberg that he thought Universal had a claim. There are no documents or written analysis attendant upon this decision, and Hadl in his testimony gave no rationalization for his conclusion. Hadl then called Kroft and asked him to play the game and testified that Kroft reported back that he thought Universal had a claim. Hadl directed Kroft to prepare a complaint and get a telex ready to send to Nintendo. During this conversation, Hadl and Kroft did not discuss Universal's rights in King Kong or King Kong merchandising, and Hadl does not know if Kroft talked to anyone else concerning Universal's claim at this time. There was no direct evidence of any internal Universal deliberation or consultation with respect to the direction to prepare a telex and a complaint. Hadl subsequently repeated Kroft's advice to Sheinberg.

No contemporaneous documents have been presented relating to these conclusions, and Kroft was not a witness by deposition or at the trial. There was no

amplification or justification of Kroft's alleged statement that Universal had a claim or any analysis of the merits of the professed claim. It is inferred from the absence of Kroft's testimony and his continuing close relationship with Universal that had he testified his testimony would have been unfavorable to Universal on the subject of its trademark claim. There was no testimony presented to lead to the conclusion that Hadl had the executive responsibility for directing the preparation of a complaint to enforce Universal's rights.

From the facts already found, it is rational to infer that the direction to consult Kroft and to prepare the complaint came from Sheinberg, the only other person at the executive level with whom the Donkey Kong matter was discussed, despite Hadl's testimony that he consulted Kroft because of the latter's role in the California litigation. There is no date in April fixed for the Hadl family game playing or the Kroft conversations. In addition, all of the initial activities relating to Coleco and Nintendo were undertaken without consultation or reference to those officers usually involved in licensing at Merchandising or without reference to Di Muro, the in-house expert on King Kong rights. It is a reasonable inference that all of these activities took place under Sheinberg's direction in preparation for the anticipated meeting with Coleco to discuss the future relationship between Universal and Coleco. Sheinberg during this period knew of the impending meeting with Greenberg of Coleco, at which a claim of rights in King Kong would at the least become a bargaining chip.

On April 27, 1982, Sheinberg and Greenberg met with other officers of both companies to discuss among other things a possible investment in Coleco by Universal. At the meeting, Greenberg described Coleco at length for Sheinberg, including Coleco's imminent plans to introduce Coleco-Vision, featuring the immensely popular Donkey Kong cartridge. At that point Sheinberg interjected, saying that Universal "owned King Kong" and that he had seen the Donkey Kong game and thought that it would infringe on Universal's rights. Greenberg was surprised at this suggestion, which struck at the heart of Coleco's marketing plans. He offered to consult with his lawyers and look into the matter further. Sheinberg advised that there could be no further business discussions between the two companies until the question of Donkey Kong was resolved.

After meeting with Coleco, Sheinberg told Hadl to add Coleco as a recipient of the telex, and they discussed getting a royalty from Coleco on sales of Donkey Kong products. Hadl, in turn, told Kroft to add Coleco to the telex he was preparing regarding Donkey Kong.

On April 28, 1982, without any further consultation or documentation, Universal sent telexes to Nintendo and Coleco claiming that Universal was the "sole and exclusive owner of all rights (except book publishing rights) in and to the name, title, character, and story 'King Kong' and 'Kong' ... including, without limitation, the right to exploit, license and sell games, toys, video displays and other forms of merchandising based upon or using the 'King Kong' name, title and character." Universal further stated that Donkey Kong infringed on its exclusive rights and demanded (1) that all marketing of Donkey Kong cease, (2) an accounting for all profits, and (3) a destruction of inventory. Court actions for "restraining orders, injunctions, and damages" were threatened, and an invitation to settle within forty-eight hours was offered.

After receiving the telex, Nintendo reviewed its Donkey Kong trademark application and search, reviewed an opinion from trademark counsel regarding Nintendo's ability to use Donkey Kong as a trademark, commissioned a King Kong trademark search, and tried to determine whether and how Donkey Kong could infringe on the King Kong movies.

Between April 27 and May 6, 1982, Coleco and Universal had several discussions concerning settlement of Universal's claims to all the rights to King Kong. By May 5,

1982, Coleco and Universal had agreed to settle their dispute. Pursuant to the agreement, Coleco would receive a covenant not to sue from Universal which would obligate Coleco to pay Universal royalties on sales of Donkey Kong products. It was understood that if Coleco could convince Nintendo to settle, Universal would reduce the royalty rate Coleco would have to pay Universal. Coleco convinced Nintendo to meet with Universal on May 6, 1982, without advising Nintendo representatives of the agreement with Universal. The possibility of a Universal investment in Coleco or joint undertaking was still unresolved. The covenant not to sue was executed on May 12, and Universal did not seek or obtain any right to control or supervise Coleco's exploitation of Donkey Kong.

Shortly after Universal had sent the telexes to Nintendo and Coleco asserting its rights in King Kong, Hadl summoned Sifuentes into his office. He was upset upon learning that Universal had licensed Tiger, and "wanted to know on what basis [Universal] had made a license" noting the Tiger agreement to be a lousy license because it offered only a small return to Universal and because its exclusivity provision could prevent Universal from concluding its agreement with Coleco. Sifuentes explained that she had discussed the Tiger license initially with Di Muro and that they "had decided to go ahead," and that Di Muro had decided sometime after the February Toy Fair that Universal should cease licensing King Kong and that the Tiger license should be terminated because Tiger was probably going to copy Donkey Kong. Sifuentes also testified that Hadl's concern resulted from the fact that this was a "Sheinberg project."

On May 4, 1982, Universal advised Tiger by mailgram that it would terminate Tiger's license agreement unless Tiger submitted King Kong materials for Universal's approval. With a cover letter dated May 5, 1982, Tiger submitted various materials to Universal. After viewing Tiger's King Kong game, Hadl "thought the two games [Donkey Kong and King Kong] were substantially similar."

On May 6, 1982, representatives from Universal, Coleco and Nintendo met. Present at the meeting for Nintendo were Arakawa and Lincoln. Schwefel and Coleco's outside legal counsel were present on behalf of Coleco. Hadl and Kroft were present on behalf of Universal. Universal asserted it owned all rights in King Kong and that Donkey Kong was an infringement of those rights. The Nintendo representatives questioned the source of Universal's rights in King Kong. Lincoln reported that Nintendo had commissioned a trademark search of "King Kong" after receiving Universal's telex that the trademark search report revealed numerous longstanding users of "King Kong," and that Universal had only recently applied for a trademark registration of King Kong. During the meeting Nintendo and Coleco representatives caucused apart from Hadl and Kroft. In response to Nintendo's request for proof of Universal's ownership in King Kong, Kroft stated that the question of Universal's rights was "open and shut." Hadl said Kroft would send a chain of title which would show Universal's rights to King Kong. The meeting terminated without resolution and without Nintendo learning of the Coleco agreement with Universal. On May 7, another Universal/Coleco meeting was held to discuss a $30 million purchase of Coleco debentures by Universal.

On May 8, 1982, Universal sent a mailgram to Tiger terminating Tiger's license and stating:

[T]he advertising, packaging and catalog material which you have prepared and distributed without our prior approval makes clear that the display board and concept of your "King Kong" mini-arcade tabletop electronic game is substantially similar to the display board and concept of a popular arcade game called "Donkey Kong" currently owned and marketed by another company ... we hereby terminate the license agreement and demand that you immediately cease and desist from the design, manufacture,

sale, distribution, promotion or advertising of any products entitled "King Kong" (or any variation thereof).

Although there is no direct evidence on the subject, it is appropriate to conclude that Universal sought to cancel the Tiger license principally to clear the way for its intended licensing program then underway with Coleco.

Nintendo telephoned Hadl on May 11, 1982 and stated that it had received mixed signals from the May 6, 1982 meeting. On the one hand, Universal had threatened a lawsuit, and, on the other hand, it wanted to do business with Nintendo. Hadl stated that the signals were not mixed; "they were mutually exclusive." According to Hadl, Nintendo would have to come to terms with Universal before the two companies could have any other business dealings. Nintendo again insisted that Universal explain the source of its rights and specifically demanded a chain of title. Hadl stated that Kroft would send Nintendo the chain of title. No chain of title or other explanation of Universal's alleged rights was ever sent. Universal also advised Nintendo that the time period for settlement would only extend to the Consumer Electronics Trade Show to be held in June, 1982.

On May 12, Sifuentes forwarded to Hadl the collection of King Kong memos and material which had been discussed with DiMuro. On May 12, Coleco and Universal formally agreed upon the covenant not to sue. It was also understood that Universal would not seek preliminary injunctive relief which might interfere with the Coleco marketing of its Donkey Kong product. Thereafter Coleco was advised by Universal's investment banker, Felix Rohatyn, that Universal was no longer interested in the debenture purchase. On May 14, 1982, Hadl admitted to Lincoln that the Tiger game was a "knock-off" of Donkey Kong and stated that Universal had cancelled the license because it was apparent that Tiger was infringing Nintendo's copyright in Donkey Kong.

On May 18, 1982, Tiger informed Hadl by letter that it considered its license "to be in full force and effect" and proceeded to question Universal's rights in King Kong, asserting the following:

Tiger is perplexed concerning MCA's claimed right to the ownership and control of the title King Kong in the United States. Tiger now knows that neither MCA nor Universal City Studios, Inc. had federally registered any such claim of ownership or control under the Trademark Laws of the United States at the time MCA induced Tiger to sign the Merchandising License Agreement. It was not until January 18, 1982 that Universal first placed on file applications under the Trademark Laws for the products it has previously licensed in September 1981 to Tiger. In this regard, we direct your attention to the fact that numerous companies unrelated to MCA have obtained Federal registrations for King Kong. We are uncertain as to the basis, in fact, for MCA's assertion of its right to that title for the products in the Merchandising License Agreement.

Universal was concerned that Tiger's challenges would create problems, but as of May 21, 1982, Universal still considered the Tiger license to be terminated.

A luncheon meeting was set up for May 21, 1982 between Arakawa and Lincoln on behalf of Nintendo and Sheinberg and Hadl from Universal. At that meeting, Sheinberg again brought up the possibility of future business relations between the two companies if only Nintendo would agree to pay a royalty on Donkey Kong. He further stated that Universal was very litigious and that its "litigation department even turned a profit." He cautioned Nintendo not to misinterpret Universal's intention to file suit if a settlement was not reached, and said that Sony's president had made this mistake and the result had been the Betamax lawsuit. Lincoln responded that after a full investigation, Nintendo did not believe that Universal's claims had any merit. As the May 21, 1982 meeting ended, Sheinberg stated that Nintendo had better

start "saving money to pay its attorney's fees." Immediately after this meeting, Universal decided to file this lawsuit and to renegotiate Tiger's license for King Kong video games. Until this decision, consultation with DiMuro on the subject of the Nintendo action was consciously avoided.

After the May 21 meeting with Nintendo, Universal met with Tiger and advised that it would reconsider terminating the license if Tiger made some modifications to its games. Tiger then made three modifications to its King Kong game. These changes were: (1) putting a fire hat on the hero character; (2) adding bombs to the game; and (3) making the floors horizontal. The bombs replaced barrels which were present in the initial Tiger materials viewed by Universal and were substantially similar to the fireballs in the Donkey Kong audio-visual work. The horizontal floors replaced zig-zag ramps present in the initial Tiger materials viewed by Universal and were similar to the ramps which appear on the rivets board game screen of the Donkey Kong audio-visual work.

Tiger submitted its modified King Kong game to Universal by early June 1982. Hadl and Rissman played the modified Tiger game on a home video system at a Sears, Roebuck store. Hadl approved the modified Tiger King Kong game but did not compare the modified game to the Donkey Kong audio-visual work. Universal then modified its licensing agreement with Tiger. The modifications were drafted by Di Muro and Hadl and included granting Tiger a nonexclusive as opposed to an exclusive license, thereby strengthening Universal's King Kong claim for viable licensing rights and eliminating Tiger's ability to challenge Universal's license to Coleco.

On June 6, 1982, Universal announced the creation of MCA Video Games, recognizing that the video game business "looked like the biggest business around." On June 29, 1982, Universal filed suit against Nintendo, claiming that Universal was the owner of all trademark rights in King Kong and that Nintendo's Donkey Kong game infringed on its rights in King Kong. The complaint which Universal filed had been drafted by Kroft. On or about June 29, 1982, Universal also issued a press release announcing that it had filed the lawsuit against Nintendo and that it had entered into a license agreement with Coleco for Donkey Kong and that it owned "the name, character, the visual image of 'King Kong.'"

Universal's complaint asserted broad rights in King Kong:

6. By virtue of certain agreements and written assignments entered into between Universal and RKO General Inc. and Universal and the heirs of Merian C. Cooper, Universal is the owner of all trade name, trademark, service mark and other rights in the name, character and story of KING KONG, created and developed by Merian C. Cooper prior to 1933 and produced and released as a motion picture under the name "KING KONG" ... and subsequently as a remake motion picture ... in 1975.

\* \* \* \* \* \*

8. The name KING KONG denotes a gigantic gorilla and the story KING KONG, as made popular by [the] motion pictures of RKO and Dino De Laurentiis to whose rights in KING KONG Universal has succeeded, tells of the gorilla's discovery by an American movie crew on an island in the South Pacific, his subsequent capture and transport to New York and the gorilla's attachment for the female star of the film. Among the most popular and famous scenes of the "KING KONG" motion pictures produced by RKO and Dino De Laurentiis is KING KONG at the top of a large building holding the female lead of the film captive while attempting to repel the efforts of others to rescue her.

\* \* \* \* \* \*

17. Defendants' use of Universal's KING KONG name, character and the elements of the KING KONG story made popular by the "KING KONG" motion pictures as aforesaid is without Universal's consent or permission and without

the consent or permission of any of Universal's predecessors in interest.

(Complaint ¶¶ 6, 8, 17).

In the summer of 1982, while discussing a possible script for a remake of King Kong, Sheinberg told the scriptwriter to consult with Di Muro:

to be sure that we [do] not inadvertently infringe on any rights owned by RKO or otherwise—or indeed Dino De Laurentiis ... both of those parties indeed have protectible rights in the King Kong property ... [and Universal should not be] in the position of being infringers of those rights ... anything that was protectible in the particular screenplay or the photoplay of King Kong, in either one of those two films, ... should not through inadvertence or worse be used.

In planning a King Kong attraction for Universal Studios Tours, Sheinberg advised the project manager to contact Di Muro and get "legal advice ... so that we [don't] depict the ape or anything else that might be protectible."

In July 1982, the designer of the Tours attraction was advised that Di Muro instructed that:

... the King Kong character is not to be modelled after the ones used in either of the two motion pictures, but rather is to be based upon generic apes or an ape from a zoo or from wild life.

Universal's contract with the designer specified that "the 'King Kong' figure shall be an original design of a living ape figure. In no event shall the figure be based on the King Kong figure used in any previously released motion picture." There was no reconciliation between these internal Universal positions which directly conflict with the blanket claim of ownership in the complaint.

Throughout discovery in this litigation, Universal pointed cryptically to unspecified documents as the source of its rights. Sheinberg asserted in his deposition that the source of Universal's rights derived from an agreement not identified in the interrogatory responses and that it had "consistently been our position" that Universal's rights derived from that agreement. Ultimately, Universal relied only on the Cooper Judgment rendered in the RKO litigation and the Cooper Agreement assigning the Cooper Judgment to Universal as the alleged source of its rights. During depositions, Sheinberg either refused to testify about what he believed to be Universal's rights in King Kong or testified that he did not know what rights were owned, although he specifically authorized filing the complaint in this action.

Prior to this litigation, Universal failed to mount any efforts to deter unauthorized third-party uses of the King Kong name, character and story, despite its claim of exclusive trademark rights. To explain this lack of enforcement effort, Universal claimed that it had not been aware of any unauthorized uses of King Kong before Nintendo's alleged infringement. This claim of ignorance is unsupported by the evidence of Universal's various trademark searches and general knowledge of third-party use.

On or about November 1, 1982, Nintendo entered into a licensing agreement with Atari, a Warner Communications, Inc. ("Warner") subsidiary, providing for Atari's use of the Donkey Kong name and character in connection with home computers. Sheinberg told representatives from Atari and its parent, Warner Communications, Inc., that the Donkey Kong property violated Universal's rights, that Nintendo's major licensee, Coleco, had signed an agreement with Universal, and that Atari should sign an agreement if it did not want to be sued by Universal. Warner determined that a failure to come to an agreement with respect to Donkey Kong would threaten its joint ventures and other business relationships with Universal. On January 19, 1983, Universal and Atari entered into an agreement by which Universal received a royalty of three percent of the gross wholesale sales of Donkey Kong computer game products. The Atari agreement is virtually identical to the Coleco agreement. Universal did not seek or obtain any right to control or supervise

Atari's exploitation of Donkey Kong, and the existence of the agreement was not disclosed to Nintendo.

In November 1982, Nintendo negotiated a license agreement with Ruby-Spears giving Ruby-Spears the option to use the Donkey Kong name and character in a cartoon television series. In connection with the negotiations, Nintendo informed Ruby-Spears about the Universal litigation with Nintendo. Ruby-Spears told Nintendo there was no way Ruby-Spears or CBS Television was going to allow a Donkey Kong cartoon series to be aired without an arrangement with Universal. According to Ruby-Spears, Universal had a reputation of being very litigious, and although Ruby-Spears did not believe Universal had any rights, it advised another Nintendo licensee that Ruby-Spears intended to enter into a license with Universal because of Universal's power in the industry. On or about March 31, 1983, Universal and Ruby-Spears agreed that Universal would receive monies from the exploitation of Donkey Kong television programs and the right to distribute the programs produced off-network throughout the world in all media and forms. Universal did not seek or obtain any right to control or supervise Ruby-Spears' exploitation of Donkey Kong. On May 6, 1983, Universal issued a press release announcing that it had secured international television distribution rights in Donkey Kong. Universal's press release further stated that: "Donkey Kong, which is scheduled to appear for the first time on the CBS Network for Fall 1983, is based on the year's most popular video arcade game, which is made by Nintendo."

After obtaining a list of Nintendo's licensees and copies of the license agreements in discovery, on or about January 3, 1983, Universal sent letters to Nintendo's licensees stating that Universal was "the owner of the trademark and trade name rights in the name 'King Kong' the gorilla character 'King Kong' and certain pictorial and graphic depictions of the character 'King Kong' made famous by several motion pictures." Universal demanded that the licensees either desist from marketing Donkey Kong products or obtain a license from Universal authorizing the use of the "name 'King Kong' and variations of the name, including 'Donkey Kong'." Universal further stated that the licensees should submit for Universal's inspection and evaluation the licensees' Donkey Kong products.

Universal had repeatedly assured Coleco, Atari and Ruby-Spears that it would aggressively pursue all other Nintendo licensees. In a memorandum to Hadl and Sheinberg, dated February 15, 1983, Mr. Newman, an MCA Officer, stated "I would note that in dealing with Coleco, Atari and Hanna Barbera [Ruby-Spears] we have made repeated assurances of our intent to aggressively pursue all licensees. Since Donkey Kong products seem to still be alive, such pursuit should be undertaken aggressively at this time and not left on the back burner." Consistent with its plan to undertake aggressive pursuit of Nintendo licensees, Universal demanded that Nintendo's remaining two major licensees, Ralston Purina and Milton Bradley, enter into agreements with Universal.

Although Hadl informed Milton Bradley in the Fall of 1982 of the Universal-Coleco agreement and stated that Universal might take action for use of the Donkey Kong trademark in connection with board games, jigsaw puzzles, and card games, no action was taken until March 30, 1983. Universal's counsel then wrote Milton Bradley stating that Universal would seek damages based on Milton Bradley's "sale of [the Donkey Kong card game] and other Milton Bradley products which infringe the King Kong trademark" and stating "[w]e would urge you to give serious thought to the course of action you have undertaken, keeping in mind that others who are using the 'Donkey Kong' name to sell their products have obtained from Universal an appropriate license authorizing them to use this variation of the 'King Kong' trademark." Milton Bradley successfully marketed the Donkey Kong products. Universal took no further action.

Universal also asserted its King Kong rights to another major Nintendo licensee, Ralston Purina Company, which had entered into a Nintendo license agreement on or about February 9, 1983, providing for the use of the Donkey Kong name and character in connection with breakfast cereal. Having been advised of Universal's claim by Nintendo, Ralston Purina had examined the pleadings and other records from this litigation and from the California litigation and had reviewed public trademark and copyright records. Based on its investigation, Ralston Purina concluded that Nintendo was the exclusive owner of the Donkey Kong property and that Universal did not own exclusive rights in King Kong nor did it have any rights in the Donkey Kong property.

Notwithstanding its conclusions, Ralston Purina decided to meet with Universal on February 28, 1983. Ralston Purina told Universal that it had done an investigation which revealed that Universal had no rights and pressed Universal to set forth the basis for its alleged rights in King Kong and Donkey Kong. Nonetheless, Ralston Purina told Universal that it still preferred to avoid a nuisance suit and indicated further that it would be willing to consider a one-time lump-sum payment to avoid litigation. Universal rejected Ralston Purina's lump-sum proposal and proposed an agreement that provided percentage royalties.

Ralston Purina accepted the proposal, provided that Universal would agree to refund any payments if Universal lost its lawsuit against Nintendo. Universal rejected the suggestion, saying that after Universal won this action it would own Donkey Kong. Ralston Purina inquired whether Universal would be interested in issuing a King Kong license. Discussions were broken off with a threat by Universal that Ralston Purina would not be treated as leniently as Coleco. Ralston Purina successfully marketed its Donkey Kong cereal without further action by Universal.

Universal's January 3, 1983 "cease and desist" letter claiming all rights in King Kong was sent to, among others, the following Nintendo licensees: Atari, Bates Nitewear Corporation, Charleston Hosiery, Houze Glass Corp., Manton Cork, Milton Bradley, Super Shirts, Inc., and Trim Line Sales. Seven licensees, Bates Nitewear Corp., Charleston Hosiery, Houze Glass Corporation, Manton Cork, Super Shirts, Inc., Sylva Manufacturing, and Trim Line Sales stopped producing Donkey Kong products in breach of their Nintendo license agreements, which called for guaranteed payments. With the exception of Bates Nitewear, these licensees also failed and refused to pay the guaranteed royalty specified in their licenses. As a result of Universal's interference with these licensees, Nintendo lost $94,219.56 in guaranteed royalties. Each of these licensees cited Universal's lawsuit and its demands as reasons for the breach of their Nintendo license agreements. Nintendo brought no action to enforce its guaranteed royalties.

Nintendo had a program to retain licensees who failed to pay their guaranteed royalties because of the litigation, offering to indemnify the licensees, extend their license agreements to work off their guarantees, and convince licensees that Donkey Kong was a popular character and that the licensing program was continuing. Despite Nintendo's efforts, Charleston Hosiery, Manton Cork and Super Shirts complained that the lawsuit interfered with their sales to the retail trade, with "potential customers being scared off," and major customers, such as J.C. Penney, refusing to do business with a licensee whose product was involved in litigation.

Universal's actions also interfered with Nintendo's ability to secure other licenses. Shortly after the lawsuit was filed, two potential licensees, Union Underwear and Gabriel Industries, decided not to execute their Nintendo license agreements, citing Universal's claims. Nintendo has not, however, established Universal's acts as the sole basis for its lost licenses and the consequent guaranteed royalties of $40,000 from Union Underwear and $20,000 from Gabriel Industries.

Despite Universal's repeated allegations of "irreparable injury" resulting from the alleged trademark violations by Nintendo's licensees, Universal elected not to seek preliminary relief. Instead, it embarked on the course of securing agreements from Nintendo's licensees whereby it became a partner in the distribution of millions of Donkey Kong products identified as originating with Nintendo and under Nintendo's exclusive control. Where the Nintendo licensee refused to comply, no litigation was undertaken.

### The Calculation of Damages Asserted

Universal received royalties of $4,765,371.48 from its agreements with Coleco, Atari, and Ruby-Spears. Nintendo failed to receive guaranteed royalties under existing license agreements in the amount of $94,219.41. Nintendo incurred legal fees of $1,142,545.70 in its defense of Universal's infringement action and has incurred substantial attorney's fees in pursuit of its counterclaims.

Pac Man, the most successful arcade game, is alleged by Nintendo to have generated merchandise licensing revenues of $19 million, while Donkey Kong received $2.3 million, although Donkey Kong sales of 60,000 units compared to sales of 100,000 Pac Man units. To apply the Pac Man merchandising revenues/total sales ratio to Donkey Kong would be far too speculative. Obviously there are significant differences between the licensing programs and the games beyond those caused by Universal's actions.

### The Games

The Donkey Kong video arcade game consists of four game boards—the girders board, the rivets board, the elevator board and the conveyor board. The object of the game is to maneuver Mario, the character controlled by the player, to the top of the screen to rescue the girl from the gorilla character Donkey Kong who holds her at the top of the structure. As the player maneuvers Mario to the top of the screen, he must avoid objects such as barrels and fireballs and avoid falling through gaps in the girders. He can pick up prizes which appear on the screen, such as purses and umbrellas.

When the Donkey Kong game begins, the gorilla appears at the bottom of the display screen and climbs to the top of the girder pattern. The board initially consists of seven horizontal girders attached by vertical ladders at various points. When the gorilla reaches the top, he deposits the girl atop the gridwork and then hops to the left, by his sheer weight causing the various horizontal girders to shift in such a way that each is slightly inclined. Mario then appears at the bottom of the grid work, and the machine begins to play a catchy, rhythmic musical jingle which continues throughout the game. The player controls Mario's movement by means of control stick and a "jump" button and attempts to maneuver Mario along the girders and up the ladder while jumping over barrels that the gorilla releases from above and fireballs emanating from below. Mario's walk has a rhythmic, determined quality that meshes neatly with the syncopation of the music. Mario occasionally has use of a hammer with which he protects himself from barrels or fireballs. Mario spins and falls, if hit by either a barrel or fireball, and the player has lost. The visual and aural effect of the "game play" are defined by the interaction of all of these elements, although the "tone and feel" of the game are dominated by Mario's rhythmic march, interspersed by jumps, in time with the music, in a hopefully continuous upward movement towards the girl.

A coin-operated video arcade game, such as the Donkey Kong video arcade game, consists of a video monitor, printed circuit boards (which include the memory chips), power supply, internal wiring and a control panel to play the game. The audio-visual work displayed on a coin-op video arcade game is embodied in and controlled by the printed circuit board, the memory chips and the electronic circuitry.

The Tiger King Kong video game cartridge and tabletop games have only one gameboard, which is a combination of the Donkey Kong girders board and rivets

board. It was created by watching the Donkey Kong game and creating a computer program that would replicate the Donkey Kong gameplay. The concept, feel, and play of the Tiger King Kong game are substantially similar to the coin-operated Donkey Kong game. Visual and tonal differences are more attributable to the more limited memory capacity and display medium of the home video than to any intentional effort to design distinct games. Indeed, Tiger, other than for certain limited differences, is nearly as similar to Donkey Kong as permitted by the home video cartridge technology.

Tiger revolves around the same three characters as Donkey Kong: a large gorilla, a female captive, and a male rescuer. The game begins as the gorilla climbs the horizontal girders that are joined by ladders. The male character, visually similar to Mario, though called a fireman not a carpenter, then proceeds along the girders, walking in a rhythmic fashion, climbing the ladders, while avoiding bombs dropped by the gorilla above. The musical jingle that accompanies the male figure's determined stride is nearly identical to the jingle in Donkey Kong. If hit by a bomb the male figure spins and tumbles.

Nintendo claims that it "carefully polices the marketplace to combat infringements of its valuable copyrights and trademarks." It has instituted 22 lawsuits in the United States against alleged infringers, although Nintendo has not brought any action directly against Tiger for infringement.

## Discussion

Nintendo has set forth three counterclaims: 1) misappropriation of property and unjust enrichment; 2) contributory copyright infringement; and 3) tortious interference with contract. Nintendo also seeks recovery of its attorney's fees, relying on 17 U.S.C. § 505, 15 U.S.C. § 1117, and Rule 11, Fed.R.Civ.P. These claims will be addressed sequentially.

## Misappropriation

Nintendo asserts that the Donkey Kong trademark is the exclusive property of Nintendo and that Universal's agreements with Coleco, Atari and Ruby-Spears, which resulted in revenues of $4.76 million for Universal, constitute the misappropriation of Nintendo's trademark and the unjust enrichment of Universal. The theory of unjust enrichment is premised upon "the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another ... [w]hen and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain ..." *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337, *quoted in Friar v. Vanguard Holding Corp.*, 78 A.D.2d 83, 434 N.Y.S.2d 698, 701 (2d Dept.1980). *See Werlin v. Readers Digest Ass'n Inc.*, 528 F.Supp. 451 (S.D.N.Y. 1981). In *Reprosystem, B.V. v. S.C.M. Corp.*, 727 F.2d 257 (2d Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) the Court stated that the prerequisite to recovery under a theory of unjust enrichment is that the plaintiff "must first show that a benefit was conferred upon the defendant, and then show that as between the two parties enrichment of the defendant was unjust." *Id.* at 263. Nintendo concedes that the $4.76 million that Universal acquired from its agreements with Coleco, Atari, and Ruby-Spears would not have inured to Nintendo in the absence of Universal's agreements with the three licensees. There was no showing that the payment of the money resulted in any consequential reduction in the payment of licensing fees from these three licensees to Nintendo. Each of the three licensees satisfied its contractual obligation to pay the specified percentage of revenue to Nintendo.

Nintendo urges that a plaintiff may recover funds paid by a third party to the defendant where, as between the plaintiff and defendant, it is inequitable to permit the defendant to retain the funds. Tracing the expansion of unjust enrichment to encompass such third party recoveries to *Ar-*

*ris v. Stukey*, 2 Mod. 260, 86 Cong.Rep. 1060 (Ex.1677), Nintendo argues that:

> The point is not whether a definite something was taken away from plaintiff and added to the treasury of the defendant. The point is whether defendant unjustly enriched itself by doing a wrong to plaintiff in such manner and in such circumstances that in equity and good conscience defendant should not be permitted to retain that by which it has been enriched.

*Federal Sugar Refining Co. v. United States Sugar Equalization Board, Inc.*, 268 F. 575, 582 (2d Cir.1920). Nintendo relies on Professor Palmer's statement of the basis for this type of third party recovery:

> Most of the cases ... involved payment of money by a third person to the defendant, with restitution taking the form of recovery of the same amount by the plaintiff. The case for such relief is clearest when the plaintiff had a [preexisting] right to such payment, so that the very payment in question should have been made to him ... Recovery in quasi contract is not limited, however, to situations in which the plaintiff had a right to the very payment made. It is enough if the defendant is unjustly enriched and the amount he received was pursuant to a *right held by the plaintiff.*

G. Palmer, *IV Law of Restitution* § 21.5 (1978) (emphasis added).

■ The failure of this theory is two-fold and is accentuated by Nintendo's inability to cite cases with facts similar to those present here. If the Universal agreements with Coleco, Atari, and Ruby-Spears represent a Universal license of King Kong, or a covenant not to sue for an infringement of Universal's rights in King Kong, then the funds derived from these agreements are not based on the sale of a right held by Nintendo, whose rights are limited to Donkey Kong. Although a plaintiff's recovery based on unjust enrichment may be proper where the defendant has acquired funds from a third party by the sale of rights possessed by the plaintiff, *see* Friedman,

*Restitution of Benefits Obtained Through the Appropriation of Property or the Commission of a Wrong*, 80 Colum.L.Rev. 504, 505 (1980), such a recovery is not proper where the sale was of a right controlled by the defendant. Universal's agreements with Coleco, Atari, and Ruby-Spears were based on the sale of King Kong, not Donkey Kong, and hence do not support recovery based on unjust enrichment. Although the rights in King Kong may have been falsely asserted, *see* discussion *infra*, that the agreement was based on a professed and perhaps even pretextual right claimed by Universal prevents recovery on this theory.

Nintendo argues, however, that the Universal agreements in substance were licenses of Donkey Kong, not King Kong, and that Universal was consequently licensing Nintendo's copyrighted property. This claim, however, is "a claim based on a right equivalent to 'exclusive rights within the ... scope of copyright.' As such, it is defeated by [17 U.S.C.] section 301(a)." *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 919 (2d Cir.1980). Section 301(a) of the Copyright Act of 1976 provides:

> (a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

■ The test for preemption involves two inquiries: 1) is the work in question within the subject matter of copyright as defined in 17 U.S.C. §§ 102, 103, and 2) is the state law created right equivalent to any of the exclusive rights within the general scope of copyright as specified by 17

U.S.C. § 106. *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195 (2d Cir.1983), *rev'd on other grounds,* —— U.S. ——, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

The first test is not disputed: Nintendo's ownership of copyright registrations for Donkey Kong satisfies this test.

The second element is also satisfied. 17 U.S.C. § 106 states:

subject to sections 107 through 118, the owner of copyright under this title has the exclusive right to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies of phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

·        ·        ·        ·        ·

Nintendo essentially alleges that Universal was claiming the right to license the reproduction and sale of Donkey Kong. The state law claim of unjust enrichment through licensing of Donkey Kong is encompassed by the rights included in § 106. It is control over the right to reproduce Donkey Kong that Universal is alleged to have misappropriated and profitted from, and this right is the very essence of the copyright protection embodied in § 106. *See Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523 (S.D.N.Y.1985). If the right Nintendo seeks to vindicate is predicated on Universal's improper licensing of reproduction of Donkey Kong, the state cause of action is preempted. Recovery under an unjust enrichment theory is precluded either because Universal licensed King Kong, a property not controlled by Nintendo, or because Universal's improper licensing of Donkey Kong states a claim under only the copyright laws.

## II. Vicarious Copyright Infringement

▮▮▮ Nintendo alleges that Tiger's home video game, its mini-arcade tabletop game, and its hand-held game infringe Nintendo's video arcade Donkey Kong and Coleco's Donkey Kong games.[1] By licensing Tiger's use of King Kong in these games, Universal is alleged to be guilty of vicarious infringement, which is established if it is shown that a party, with knowledge of infringing activity, induces, causes, or materially contributes to the infringing conduct of another. *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971); *Encyclopedia Britannica Educational Corp. v. Crooks,* 558 F.Supp. 1247 (W.D.N.Y. 1983). The liability of one found guilty of vicarious infringement is joint and several with all infringers. "[A]s all united in infringing, all are responsible for the damages resulting from the infringement." *Gross v. Van Dyk Gravure Co.,* 230 F. 412 (2d Cir.1916), *quoted in Gershwin, supra,* at 1162 n. 7. The record establishes the elements necessary to find vicarious liability: an infringement of the Donkey Kong copyright by Tiger, and the knowing inducement of the infringing activity by Universal. *See generally Sony Corp. v. Universal City Studios,* 464 U.S. 417, 164 S.Ct. 774, 78 L.Ed.2d 574 (1984).

▮▮▮ A plaintiff's ownership of a valid copyright and copying by the defendant must be demonstrated to establish a copyright infringement. *Eden Toys, Inc. v. Marshall Field & Co.,* 675 F.2d 498, 499 (2d Cir.1982). The validity of Nintendo's copyright registration for the arcade game is undisputed, and copying by the defendant may be inferred where a party establishes that the defendant had access to the copyrighted work and that the two works are substantially similar. *Warner Bros. Inc. v. American Broadcasting Companies, Inc.,* 654 F.2d 204, 207 (2d Cir.1981). Access of Tiger President Rissmann to Donkey Kong is undisputed. The only le-

---

**1.** Because a copyright for only Nintendo's arcade game was submitted, only infringement of the arcade game is at issue. 17 U.S.C. § 411.

gal issue to determine is whether the games are substantially similar in protected expression, for the court must "distill the protected parts of a work from the unprotected" *Warner Bros. Inc. v. American Broadcasting, Etc.,* 530 F.Supp. 1187, 1190 (S.D.N.Y.1982), *aff'd,* 720 F.2d 231, 222 USPQ 101 (2d Cir.1983) in order to determine the impropriety of similarities among products. *See Durham Industries, supra,* at 915.

■ Because copyright protection extends only to the expression of an idea, not to the idea itself, 17 U.S.C. § 102(b), *Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954), the general "game concepts" underlying Donkey Kong are not protectible. Neither the ramps and ladders motif nor the gorilla/female captive scenario is independently protectible. *See Atari, Inc. v. North American,* 672 F.2d 607 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). Yet this does not render the entire game unprotectible, for as Professor Nimmer stated, "some limited copyright protection is nevertheless available in connection with games ... [A] relatively minimal artistic expression, if original, would render copyrightable ... the pattern or design of game boards and playing cards as pictoral or graphic works." 1 Nimmer § 2.18[H][3], quoted in *Atari, supra,* at 615.

A line must be drawn between unprotectible video game ideas and protectible expressions of those ideas. Examining this issue in the context of an admitted "knock-off," this Circuit held that a video game copyright extended beyond the computer program that generates the audio and visual elements of the game. Because different computer programs can generate the same images and game play, the Court held that "[t]he repetitive sequence of a substantial portion of the sights and sounds of the game qualifies for copyright protection as an audiovisual work." *Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852, 856 (2d Cir.1982). Although the Court did not define the precise point at which the sequence of images became too insubstantial a por-

tion of the game to warrant protection, the court "assess[ed] the entire effect of the game as it appears and sounds" and found it copyrightable. *Id.* at 857. Judge Learned Hand, before the time of video arcade games, recognized the difficulty involved in this determination when he said: "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc." Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487 (2d Cir.1960). Judge Hand defined what is known as an "abstractions test":

> Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out ... [T]here is a point in this series of abstractions where they are no longer protected, since otherwise the playwrite could prevent the use of his "ideas," to which, apart from their expression, his property is never extended. ... As respects plays, the controversy chiefly centers upon the characters and sequence of incident, these being the substance.

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). In *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157 (9th Cir.1977) the Court used the concept of idea-expression unity: where the idea and expression are indistinguishable, where the idea and expression coincide because the expression provides nothing new or additional beyond the idea, the copyright will protect against only identical copying. *Krofft,* at 1167–68; *Atari,* at 616. Some courts have used an approach of denying protection to *scenes a faire,* which are those "incidents, characters, or settings which are as a practical matter indispensible, or at least standard, in the treatment of a topic." *Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D.N.Y.1978), *see Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 979 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

Using this framework, the Court in *Atari, supra,* found that although *Pac-Man* was primarily an unprotectible game, to a limited extent its expression in terms of the shapes, sizes, sequences, arrangements, and sounds was protectible. And although the Pac-Man game could be defined by means of an abstraction of unprotectible dimension, the "audio component and the concrete details of the visual presentation constitute the copyrightable expression of that game 'idea'." *Atari, supra,* at 617. Neither the maze-chase format nor the use of "dots" to determine the success of the player was protectible. It was the substantial appropriation of the Pac-Man characters that was determinative. The Court stated:

> The expression of the central figure as a "gobbler" and the pursuit figures as "ghost monsters" distinguishes PAC–MAN from conceptually similar video games. PAC–MAN's particular artistic interpretation of the game was designed to create a certain impression which would appeal to a nonviolent player personality. The game as such, however, does not dictate the use of a "gobbler" and "ghost monsters." Those characters are wholly fanciful creations, without reference to the real world.
>
> .    .    .    .    .
>
> North American not only adopted the same basic characters but also portrayed them in a manner which made K.C. Munchkin appear substantially similar to PAC–MAN. The K.C. Munchkin gobbler has several blatantly similar features, including the relative size and shape of the "body," the V-shaped "mouth," its distinctive gobbling action (with appropriate sounds), and especially the way in which it disappears upon being captured. An examination of the K.C. Munchkin ghost monsters reveals even more significant visual similarities. In size, shape, and manner of movement, they are virtually identical to their PAC–MAN counterparts. K.C. Munchkin's monsters, for example, exhibit the same peculiar "eye" and "leg" movements. Both games,

moreover, express the role reversal and "regeneration" process with such great similarity that an ordinary observer could conclude only that North American copied plaintiffs' PAC–MAN.

> Defendants point to a laundry list of specific differences—particularly the concept of moving dots, the variations in mazes, and certain changes in facial features and colors of the characters—which they contend, and the district court apparently agreed, shows lack of substantial similarity. Although numerous differences may influence the impressions of the ordinary observer, "slight differences between a protected work and an accused work will not preclude a finding of infringement" where the works are substantially similar in other respects.

*Id.* at 617–18.

On the record in this case the Tiger game infringes on the Donkey Kong arcade game. Although neither ramp and ladder motifs nor carpenters, gorilla and heroines characters are protectible in the abstract, Donkey Kong's particular expression of a gorilla villain and a carpenter hero (with or without a fire hat) who must dodge various obstacles (whether bombs or fireballs) while climbing up ladders (whether complete or broken) and picking up prizes (umbrellas and purses) to rescue a fair-haired (whether knotted or pigtailed) hostage from the gorilla is protectible against appropriation by Universal and its licensees. The nearly identical musical background, the nearly identical march of the hero along the girders, the similar ascent of the gorilla at the outset of the game, the nearly identical progression along girders, up ladders, across rivines, all further the similarity in playing environment encountered by a customer. The tone and feel of Donkey Kong are replicated as nearly as possible in Tiger, given the diminished clarity and sophistication of the Tiger game. *See also Nintendo of America, Inc. v. Elcon Industries, Inc.,* 564 F.Supp. 937 (E.D. Mich.1982). The interaction of the characters, obstacles, background, and music in

Donkey Kong are arbitrary, fanciful, and sufficiently distinctive such that they deserve protection from a near knock-off such as Tiger. The license termination sent by Universal to Tiger is especially relevant, because it demonstrates Universal's own position that Tiger was substantially similar to Donkey Kong:

> [T]he advertising, packaging and catalog material which you have prepared and distributed makes clear that the display board and concept of your "King Kong" mini-arcade tabletop electronic game is substantially similar to the display board and concept of a popular arcade game called "Donkey Kong" currently owned and marketed by another company....

The three alterations made thereafter by Tiger are examples of differences in detail which do not materially alter the similarity in character and play that produces the infringement. *Peter Pan Fabrics, supra,* at 489; *Atari, supra,* at 618; *Sheldon v. Metro-Goldwyn Pictures,* 81 F.2d 49, 56 (2d Cir.), *cert. denied,* 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). Indeed, the nature of the alterations only emphasizes the overall similarities between the works. *Atari, supra.* Universal's knowledge of the similarities and its inducement of the infringement through its license agreement support a finding of vicarious infringement.

Pursuant to 17 U.S.C. § 504, Nintendo may elect at any time before judgment to choose either statutory damages or its actual damages plus Universal's profits from the infringement. Nintendo has chosen to recover Universal's profits, which the record establishes to total $56,689.41. Universal bears the burden of establishing that these funds were not attributable to the infringement, 17 U.S.C. § 504(b), and this burden has not been met.

### III. Tortious Interference

Nintendo's claim of tortious interference by Universal falls into three categories, relating to (1) Coleco, Atari and Ruby-Spears who breached material terms of their licensing agreements but continued to perform their other obligations; (2) Nintendo's existing licensees who breached their licenses and refused to perform as a result of Universal's actions; and (3) potential licensees who were dissuaded from doing business with Nintendo by Universal's actions.

■ The elements that must be proven to establish tortious interference with contractual relations are 1) a valid contract between Nintendo and a licensee; 2) Universal's knowledge of the contract and inducement of a breach; and 3) resulting damage to Nintendo. *Strobl v. New York Mercantile Exchange,* 561 F.Supp. 379, 386 (S.D.N.Y.1983); *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956).

■ Nintendo's cause of action for tortious interference fails with respect to its contracts with Coleco, Atari, and Ruby-Spears, because Nintendo has not proven a material breach of those contracts. Each of these agreements had a clause stating that the licensee would not "do or cause to be done any act or thing contesting or in any way impairing or tending to impair Nintendo's right in its trademark 'Donkey Kong.'" Nintendo argues that by signing license agreements with Universal, Coleco, Atari, and Ruby-Spears implicitly recognized multiple ownership rights in Donkey Kong, thereby impairing Nintendo's ownership. However, the agreement between Nintendo and these licensees also extended other rights to the licensees which establish that the agreements with Universal did not constitute a breach.

Each of these three license agreements disavowed any representations as to the scope or validity of the Donkey Kong trademark and did not indemnify the licensee for any subsequent claims of infringement brought by third parties. The agreements consequently left the licensees at risk to the extent that they exercised their rights under the license agreement. Because, under the agreement, each licensee was also responsible for defending infringement actions at its own expense, it had a corollary right to settle such actions.

The clause prohibiting the licensee from impairing Nintendo's ownership rights, read in conjunction with the licensee's assumption of risk with respect to infringement violations and Nintendo's unwillingness to indemnify the licensee, cannot be interpreted to preclude the licensee from settling cases alleging infringement.

Further, the licensees' agreements with Universal state that the agreements were made in consideration of Universal's assertion that Universal's rights in King Kong were infringed by distribution of Donkey Kong. In view of Nintendo's unwillingness to guarantee the scope of the Donkey Kong copyright, the settlement of allegations of infringement on Universal's King Kong rights did not violate the licensees' obligations not to impair Nintendo's Donkey Kong ownership.

These agreements with Universal also did not impair payment of royalties to Nintendo, nor did they alter any other licensee obligations to Nintendo. Finally, Nintendo did not sue Coleco, Atari, or Ruby-Spears for a breach of the license agreements, nor did it ever put these companies on notice of an alleged breach of the contract. Nintendo's continued acceptance of performance following what is now alleged to constitute a breach is tantamount to a waiver of its right to recover damages for the alleged breach. *Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208 (7th Cir.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980); *Specialties Development Corp. v. C.O.-Two Fire Equip. Co.*, 207 F.2d 753 (3d Cir.1953), *cert. denied*, 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074 (1954) (applying New York law). Nintendo, having derived the benefits of the license agreement, cannot now be heard to allege a breach in order to establish a claim for tortious interference with contract.

The facts as found establish that as a result of Universal's threatened litigation, Trim Line, Charlestan Hosiery, Super Shirts, House Glass, Mantan Cork, and Sylva Manufacturing failed to pay $94,219.41 in guaranteed royalties due under their license agreements. The facts as found also establish that Universal had knowledge of the existence of these contracts when it took the actions that induced the breach. Universal argues, however, that liability can attach for tortious interference with contractual relations only where the interference is knowing and improper, *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 676 (2d Cir.1983); *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980); *Restatement (Second) of Torts* § 767 (1979), and that interference in the form of a threat of litigation, as alleged by Nintendo, is improper and therefore actionable only if the litigation is instituted without probable cause and for a purpose other than securing proper adjudication of the claim. Universal also argues that the Second Circuit would extend Noer-Pennington immunity from state tort liability to a non-sham lawsuit instituted upon probable cause. *Suburban Restoration Co. Inc. v. ACMAT Corp.*, 700 F.2d 98, 100–02 (2d Cir.1983). Liability for tortious interference with respect to these licensees therefore hinges on whether or not Universal's threats of litigation were based on good faith and probable cause. *See, e.g., Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 989, 992 (1st Cir.1983).

■ Probable cause exists when a party acts in reliance upon the advice of counsel, sought in good faith after full disclosure of all relevant facts within his knowledge and information. *Restatement*, § 675. The testimony, the credibility of the witnesses, the interests—ulterior and apparent—of the various parties throughout the course of these events establish that Universal instigated this lawsuit and threatened others with litigation without meeting the good faith standard and without probable cause. To establish the defense, Universal must point to the facts and circumstances justifying its good faith belief in its claim at the time it was asserted. *See generally Tedeschi v. Smith Barney, Harris Upham & Co., Inc.*, 579 F.Supp. 657 (S.D.N.Y.1984).

Universal's limited investigation of the merits of the underlying claim was intentionally structured so that the inadequacy of the claim would remain obscured while the collateral benefits of the litigation were enjoyed. Only by consciously avoiding discovery of the lack of merit of the underlying claim could Universal hope to accomplish its ·goal. The evidence shows, moreover, that Universal's claim of broad rights in King Kong was asserted in order to join in the profits from Donkey Kong rather than to vindicate a legitimate claim to a trademark. While Universal claimed to be the "owner of all trade name, trademark, service mark and other rights in the name, character and story of KING KONG", it was unable to identify "exactly what shred of the King Kong character and name Universal owns" 578 F.Supp. at 924, it had taken no prior steps to enforce its rights, and its licensing department acknowledged the absence of broad rights to the trademark and subsequent to the filing of the lawsuit it acknowledged that it did not possess certain of the rights claimed in its complaint.

A party's bad faith "can rarely be established by direct evidence, and must often be proved circumstantially and by inference." *Zilg v. Prentice-Hall, Inc.*, 515 F.Supp. 716, 719 (S.D.N.Y.1981). Yet in this case, there is direct evidence that Universal knew it did not have the rights it asserted in its complaint. As recounted at greater length above, from June 1980 Sheinberg and others at Universal knew of the limited "merchandising" rights Universal retained in King Kong after the California litigation. This understanding was reflected throughout 1982 in the agreement with Florida Tours which required that the tour ape figure be distinct from those in the movies, by Sifuentes' and DiMuro's conclusion that Universal had no rights in King Kong and should cease licensing, by the intention to terminate the Tiger license, and by DiMuro's memo to Sheinberg making clear the limited rights Universal had. Nonetheless, Universal, when it seemed beneficial, made sweeping assertions of rights, attempting thereby to extract li-

cense agreements from companies incapable of or unwilling to confront Universal's litigation "profit center."

■■■ Universal also asserts that it was privileged to act as it did because it did so on advice of counsel. Simple recitation of the claim of "advice of counsel" cannot save Universal from the showing of a lack of good faith. In the face of a showing of bad faith, the fact that a party received advice of counsel is only one factor to be considered "in the context of the totality of the circumstances." *Central Soya Company, Inc. v. George A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983). *See also Rea v. Wichita Mortgage Corp.*, 747 F.2d 567, 576 (10th Cir.1984); *Securities and Exchange Commission v. Savoy Industries, Inc.*, 665 F.2d 1310, 1314 n. 28 (D.C. Cir.1981). The totality of the circumstances here show that whatever advice of counsel Universal received, it was insufficient to identify a cognizable right approaching that asserted in the complaint and was proffered without research or memoranda analyzing the claim. It was, moreover, advice requested by Sheiberg in the context of a business negotiation where bargaining chips would be of great value.

Throughout this litigation, Universal knew, as a result of the RKO litigation, that it had no rights to any visual image of King Kong from the classic movie or its remake. Universal understood that without this visual image it had no identifiable trademark, and when it learned of Donkey Kong and its success, it initially made the decision to cease licensing King Kong. In an about face, Universal, fully knowledgable that a major Nintendo licensee, Coleco, was commercially vulnerable to its advances, determined to take advantage of Donkey Kong's success. In order to make its position credible, Universal asserted broad rights in King Kong, including the visual images to which it knew it had no right. Universal refused, however, to reveal to Nintendo or Coleco the source of its claimed broad rights. Universal succeeded in inducing Coleco to enter a license agree-

ment, but failed to secure Nintendo's acquiesence. It then filed this complaint.

■ Because the defense of advice of counsel does not succeed, and because this lawsuit was instituted without good faith and the requisite probable cause, the elements of tortious interference with contractual relations have been proven. Damages of $94,219.41 result.

In New York:

exemplary damages are recoverable in all actions *ex delicto* based upon tortious acts which involve ingredients of malice, fraud, oppression, insult, wanton or reckless disregard of the plaintiff's rights, or other circumstances of aggravation, as a punishment of the defendant and admonition to others.

36 N.Y.Jur.2d § 176 (1984); *Giblin v. Murphy,* 97 A.D.2d 668, 469 N.Y.S.2d 211, (3d Dept.1983). *See also Le Mistral, Inc. v. Columbia Broadcasting System,* 61 A.D.2d 491, 402 N.Y.S.2d 815 (1st Dept. 1978). Punitive damages are awarded "not for the unintended result of an intentional act, but for the conscious disregard of the rights of others ..." *Hartford Acc. v. Village of Hempstead,* 48 N.Y.2d 218, 422 N.Y.S.2d 47, 53, 397 N.E.2d 737, 743 (Ct. App.1979).

■ I conclude that the conduct of Universal, as recounted above, amounts to the reckless disregard of the rights of Nintendo as well as Nintendo's licensees. Universal's conduct was highly unreasonable, and represented not mere negligence but an extreme departure from the standards of ordinary care. Exemplary damages are therefore justified.

There is no rigid formula by which to determine the proper amount of punitive damages, although they should bear some reasonable relation to the harm done, *I.H.P. v. 210 Central Park South Corp.,* 16 A.D.2d 461, 228 N.Y.S.2d 883 (First Dept.1962), *aff'd,* 12 N.Y.2d 329, 239 N.Y. S.2d 547, 189 N.E.2d 812 (1963); *Ashare v. Mirkin, Barre, Saltzstein & Gordon,* 106 Misc.2d 438, 435 N.Y.S.2d 438 (1980), and a punitive damage award will serve its deter-

rent function only if the award is sufficient to "smart" the offender. *Brink's Inc. v. City of New York,* 546 F.Supp. 403, 413 (S.D.N.Y.1982). The financial capacity of the violator as well as the nature of the offense are relevant factors. *Id.*

■ Weighing these considerations, an appropriate punitive damages award is equal to the amount of Nintendo's legal fees incurred in defending against Universal's infringement action. While recognizing the unusual nature of this means of determining the size of the award of exemplary damages, only such an award bears a reasonable relationship both to the harm inflicted and the flagrancy of the conduct causing the harm. *See I.H.P., supra,* at 889. Because the primary purpose of punitive damages is to deter similar conduct in the future, *Zarcone v. Perry,* 572 F.2d 52, 55 (2d Cir.1978), and the deterrent effect of a punitive damages award will depend upon the wealth of the defendant, *O'Donnell v. K-Mart Corp.,* 100 A.D.2d 488, 474 N.Y. S.2d 344 (4th Dept.1984), I do not find this award excessive. In view of the wantonness of the conduct involved, the wealth of Universal, the profits derived from the misuse of threatened litigation, and the necessity for inhibiting this improper use of judicial process, I conclude that an award equal to Nintendo's attorney's fees in defending against Universal's Lanham Act claim is appropriate.

**IV. Attorney's Fees**

■ Nintendo has moved for attorney's fees pursuant to 17 U.S.C. § 505, 15 U.S.C. § 1117, and Fed.R.Civ.P. 11.

**1. 17 U.S.C. § 505**

Nintendo moves for attorney's fees incurred in establishing Universal's vicarious copyright infringement on Donkey Kong. Section 505 provides that in a copyright action "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." This award is within the discretion of the court, and "[b]ecause Section 505 is intended in part to encourage the assertion of colorable copyright claims

and to deter infringement, fees are generally awarded to prevailing plaintiffs." *Diamond v. Am-Law Pub. Corp.*, 745 F.2d 142, 148 (2d Cir.1984). No basis for denying the fees, in view of the presumption in favor of granting them, has been presented. Given the history behind this lawsuit, as recounted above, Universal's recognition that the games were substantially similar, and Universal's use of Tiger as a means of strengthening its position in negotiations with Coleco, the assessment of attorney's fees incurred in establishing the violation to be appropriate.

### 2. 15 U.S.C. § 1117

Nintendo also has moved for its attorneys fees incurred in defense of Universal's trademark and unfair competition claims. Section 1117 of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney's fees to the prevailing party." 15 U.S.C. § 1117. This motion is timely. *White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982); *Bittner v. Sadoff & Rudoy Industries*, 728 F.2d 820 (7th Cir. 1984).

Attorney's fees are available to defendants under § 1117 only in exceptional cases. 15 U.S.C. § 1117; *Sanford Research Co. v. Eberhard Faber Pen & Pencil Co.*, 379 F.2d 512 (7th Cir.1967). Such an award has been found merited where an action was brought in bad faith, without an adequate investigation of the merits of the claim. *Viola Sportswear, Inc. v. Mimun*, 574 F.Supp. 619, 621 (E.D.N.Y.1983). In *Mennen Co. v. Gillette Co.*, 565 F.Supp. 648 (S.D.N.Y.1983), *aff'd*, 742 F.2d 1437 (2d Cir.1984) the court awarded attorney's fees, observing that: "[t]here is a substantial overtone in this case to warrant an inference that this suit was initiated as a competitive ploy. As such it carries necessary damage to the defendant when the plaintiff's claims are found, as they are here, to have no real substance." *Id.* at 657. The trademark case alleged by Universal, as recounted above, was initiated for reasons other than a sincere belief in the merits of the underlying claims, and the investigation, or lack thereof, that preceded filing the complaint was designed to avoid discovery of the lack of substance of the complaint. These factors establish that this case was exceptional within the meaning of 15 U.S.C. § 1117 both because it was initiated in bad faith and because the suit was designed to serve ulterior business motives. The award of attorney's fees pursuant to § 1117 provides an additional basis for granting Nintendo its attorney's fees for the successful defense of the Lanham Act claim but should not provide a double recovery.

### 3. Rule 11

Nintendo has also moved for attorney's fees pursuant to Fed.R.Civ.P. 11. Fees are granted pursuant to Rule 11 for Nintendo's defense of Universal's infringement claims. This award is not supplementary to the awards pursuant to the claim for tortious interference and pursuant to § 1117, but provides an additional foundation for reaching the same result.

This case was filed prior to the amendment of Rule 11 on August 1, 1983, and the standard that must be applied is therefore that of the pre-amendment rule. The assertions made in the complaint do not comport with the mandates of Rule 11. In *Eastway Const. Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985) the Circuit observed that pre-amendment Rule 11 required a subjective finding of bad faith in order to support sanctions. *See Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980). The history of this action, which has been recounted at length above, demonstrates that this standard is met. When the complaint in this action was filed, Universal knew that the allegations of sweeping ownership in King Kong were unsupported by the rights Universal actually possessed. Universal used the lawsuit as part of a larger effort to acquire some portion of the profits derived from Universal's and Coleco's distribution of Donkey Kong. Universal, and Sheinberg, viewed corporate litiga-

tion as a "profit center," and the known insufficiency of the claims asserted did not inhibit the use of litigation where the opportunity for profitable settlement existed. Attorney's fees will be awarded to Nintendo for its defense of Universal's claims.

Rule 11 does not alter the traditional "American Rule" *see Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) with respect to attorney's fees incurred by Nintendo in prosecution of its counterclaims. But *see* section *1, supra.*

**Conclusion**

Nintendo's counterclaim for unjust enrichment is denied. Its counterclaims for vicarious copyright infringement and tortious interference with contractual relations are granted, and attorney's fees are awarded as set forth above. Damages as set forth above will be awarded. Submit judgment on notice.

IT IS SO ORDERED.