**TOPPS CHEWING GUM, INC., Plaintiff,**

v.

**IMPERIAL TOY CORPORATION, Defendant.**

No. 87 CIV 1139.

United States District Court, E.D. New York.

May 19, 1988.

Shea & Gould, New York City (Fran M. Jacobs, David A. Picon, of counsel), for plaintiff.

Steinberg & Raskin, New York City (Martin G. Raskin, of counsel), Spensley, Horn, Jubas & Lubitz, Los Angeles, Cal., for defendant.

### MEMORANDUM–DECISION and ORDER

BARTELS, District Judge.

This is a motion for summary judgment by plaintiff Topps Chewing Gum, Inc. (hereinafter "Topps") limited to the issue of liability for alleged breach of a license and trademark agreement by the defendant Imperial Toy Corporation (hereinafter "Imperial"), and also a motion for dismissal of Imperial's four counterclaims.[1] At the same time Imperial cross-moves for summary judgment with respect to its counterclaims for breach of contract and for breach of express warranty of title. These motions do not involve the determination of the amount of royalties or the amount of damages, if any, which might be due either party. The following are the undisputed facts:

#### Facts

The parties entered into a "best efforts" contract beginning May 12, 1986 and expiring December 31, 1987 which granted Imperial exclusive rights to manufacture, sell and/or distribute in the U.S. and Canada goods bearing Topps' trademark "GAR-BAGE PAIL KIDS" (U.S.Reg. No. 1,359,-512) (hereinafter "GPK"). No mention was made in the contract of the place where these articles had to be manufactured or acquired except for a rider to the agreement which provided that "(m)anufacture or shipment from or to any country other than the United States or Canada ..." required the prior written approval of Topps. Topps warranted that, "we own or control the specified proprietary subject matter ... and have the right to grant license rights to use thereof in the Territory." Topps further promised to indemnify Imperial against "all claims, suits, damages and expenses, including legal fees, arising out of our breach of our representation hereunder."

In return for its license to use the GPK trademark, the defendant agreed to: 1) make a nonrefundable annual advance against royalties of $25000, payable upon execution of the contract; 2) pay Topps royalties set at 10% of gross wholesale sales of all articles containing GPK representations, as well as to make quarterly accountings and royalty payments to Topps, with the minimum annual royalties guarantee set at $75000; and 3) use its best efforts to manufacture, sell and/or distribute substantial quantities of the articles during the entire term of the contract.

At the time the contract was entered into, a separate action was pending in the United States District Court for the Northern District of Georgia, entitled *Original Appalachian Artworks v. Topps Chewing Gum, Inc.* (hereinafter "the Georgia action") in which OAA, the copyright holders of the "Cabbage Patch Dolls", brought suit against the current plaintiff claiming in-

---

1. Topps' first cause of action is for "at least $268,959.85 in actual damages through September 30, 1986" as well as for other damages, costs and attorneys' fees. Its second cause of action is for an additional royalty of ten percent of all gross wholesale sales of GPK articles made subsequent to September 1986.

Imperial's first counterclaim is for breach of contract by Topps, based on the theory that the Customs' seizure constitutes the equivalent of granting an injunction, and that, as per the terms of the agreement, the agreement has ceased and Imperial is entitled to payment of the "pre-paid royalties" of $25000. Its next counterclaim is based on a theory of breach of express warranty of title. It claims it has sustained damages in excess of $20000. Imperial also claims negligent misrepresentation on the part of Topps concerning the latter's prediction as to the outcome of the OAA action, and demands damages in excess of $20000. Finally, Imperial counterclaims on the basis that Topps has wrongfully retained the $25000 in prepaid royalties it received from Imperial, and has therefore been unjustly enriched in that amount, plus interest. Imperial also asks for attorney's fees and costs.

fringement of its copyright through Topps' use of the GPK mark. In light of the pending OAA litigation, Imperial sought and obtained assurances from LMI, Topps' agent, that Topps would likely prevail in the Georgia action as soon as May 1986. Upon this point, Topps agreed to the following clauses: "You (Imperial) are fully aware of the *Original Appalachian Artwork, Inc. (OAA) v. Topps Chewing Gum, Inc.* lawsuit now pending in the U.S. District Court for the Northern District of Georgia ... In the event OAA is granted an injunction against Topps, all prepaid royalties shall be refunded ... and this License shall cease."

On August 29, 1986, after finding that, *inter alia,* "... (Topps) knew as of mid-October 1985 that it was intentionally violating (OAA's) rights ...", the Georgia court ruled that OAA, "... is entitled to a preliminary injunction. Said injunction will issue upon application of the plaintiff. The plaintiff will be required to post a substantial bond ..." *Original Appalachian Artwork, Inc. v. Topps Chewing Gum, Inc.,* 642 F.Supp. 1031, 1041 (N.D.Ga.1986). Because OAA never made the application or posted this bond, the preliminary injunction never issued. On February 2, 1988, Topps eventually settled the case by entering into a stipulation with OAA which, *inter alia,* granted Topps unqualified use of the GPK name through September 1, 1987 (in the U.S.) and February 1988 (abroad), and the Georgia action was dropped.

The defendant obtained at least some of its GPK articles from abroad for sale in the U.S. Upon learning of the Georgia decision, even though no bond had been filed, the U.S. Customs Service nevertheless began to deny entry of Imperial's GPK goods into the United States beginning in September 1986. The basis for this action was that the goods allegedly infringed upon OAA's rights in Cabbage Patch Dolls. Imperial now claims that because all such GPK articles were made outside the United States, it was effectively prevented from enjoying the benefits of its licensing arrangement with Topps and further contends that several of its customers, concerned about the effects of the Georgia

decision and the customs seizures, cancelled orders for GPK articles. As a result, Imperial claims it was forced to sell what GPK products it had already imported at "distress" prices.

Imperial unsuccessfully sought Topps' cooperation in persuading the Customs Service to free the seized goods and allegedly expended $3665.00 in attorneys' fees unsuccessfully fighting the seizures. Imperial's customs counsel wrote several letters to the U.S. Customs Service stating, *inter alia,* that "the merchandise imported by (Imperial) is covered by *valid* registered Copyrights issued to Topps ..." and that because "no ... bond ha(d) been posted ... accordingly no preliminary injunction has been granted ... and no preliminary injunction is now sought (by OAA)." Imperial further informed customs that "(t)he Customs Service has no legal authority to deprive Topps or (Imperial) of the use of the registered trademark (GPK), under Trademark law or under any provision of the Tariff Act or Customs Regulations ... (I)n the absence of a judicial order to the contrary ... Imperial denies any allegation of copyright infringement ..." (Affidavit of Jacobs in opposition to cross-motion for summary judgment, Exhibits A–D). At no time did Imperial inform Topps that it considered that the contract had "ceased" until it filed its answer and counterclaim in response to Topps' amended complaint.

On October 31, 1986, Imperial wrote to Topps, stating that "under normal circumstances, the first royalty payment would have been due" but because of the effects of the Georgia court decision and the seizures "we are not prepared to make any payments at this time ..." On November 18, 1986, Imperial wrote to Topps that "Total Earned Royalties Not Paid are $268,-959.85."

Consequently, pursuant to the terms of the contract, Topps gave Imperial ten days written notice that it would terminate the contract effective November 27, 1986 unless it received all past due royalty payments. Imperial failed to remit such payments and therefore Topps terminated the contract. To date, Imperial has made no

payments other than the initial $25000 royalty advance, even though Topps claims that Imperial continued to sell the GPK articles at least through December 1986. Imperial sold $2,939,598.20 worth of licensed articles as of the end of September 1986, and it sold another $312,532.72 in licensed articles in the three following months.

Topps then brought this suit, seeking, *inter alia*, royalties allegedly owed to it by Imperial, an injunction and an accounting. According to Topps, Imperial has "... neither accounted to (it) for any sales made prior or subsequent to its termination nor sent (it) a Certificate of Destruction, as required by the Agreement." Imperial, in its answer, has interposed several affirmative defenses and counterclaims. Topps now moves for summary judgment on the issue of liability as well as for dismissal of the counterclaims while at the same time Imperial cross-moves for summary judgment on both the issues of liability and damages.[2]

### Discussion

The Court is well aware that the question to be decided on a summary judgment motion is whether, upon review of the entire record, there exists any triable issue of genuine material fact. [Fed.R.Civ.P. 56(c)]; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980). Upon the point whether there is an issue involving a genuine material fact, as explained in *Consumers Power Co. v. Nuclear Fuel Services, Inc.*, 509 F.Supp. 201, 207 (W.D.N.Y.1981), the moving party bears the burden of proof. Speculation, conclusory allegations and mere denials are insufficient to raise genuine issues of fact. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984). "We are not unmindful that, prop-

erly employed, summary judgment is a useful device for unmasking frivolous claims and putting a swift end to meritless litigation.... Thus, the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party.... The litigant opposing summary judgment, therefore, 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial.... Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Quinn*, 614 F.2d at 445. (Citations omitted.) We know, as stated in *Heyman v. Commerce Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir.1975), that "(w)here contract language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper." In this case, however, there are not two fairly reasonable interpretations available.

The issues raised are questions of law, not of fact. They may be categorized as follows: whether (1) the alleged misrepresentations by Topps induced Imperial to enter into the contract and whether Topps misrepresented its ownership of and its right to license the use of the GPK; (2) there was a breach of warranty of title; (3) the Georgia court's determination constituted an "injunction" as referred to in the licensing agreement so as to discharge Imperial's contractual obligations; (4) Imperial was in any way substantially frustrated in completing the purposes of the contract;[3] and (5) Imperial waived any right to terminate the agreement.

### I. Alleged Misrepresentations

Imperial alleges that the contract is invalid because of certain misrepresentations: (1) fraudulent representations made to induce Imperial to enter into the license agreement and (2) misrepresentations of ownership.[4] Both of these allegations ov-

---

**2.** In support of its argument that Topps may not enforce the licensing agreement, Imperial submitted, *inter alia*, the opinion of an alleged expert attorney, Robert S. Ogden.

**3.** Although Imperial entitles this defense "Failure of Condition Subsequent", its argument is essentially one of substantial frustration of purpose.

**4.** Imperial also alleges a misrepresentation by

erlap and are predicated upon alleged statements made by Topps that the Georgia decision would be favorable, thereby misrepresenting Topps' ownership of the trademark and copyrights and at the same time inducing Imperial to enter into the agreement.

### a. *Fraudulent Inducement*

■ Imperial claims that the contract is invalid because it was predicated upon the misrepresentation that the Georgia decision would be a favorable one, thereby fraudulently inducing Imperial to enter into the agreement. The contract itself belies that allegation, inasmuch as it specifically provides that upon the issuance of an injunction, "this license shall cease." [5] Any representations made as to the probable outcome of the *OAA* litigation could only have involved statements which Imperial should obviously have known were ones of opinion only and which were based on facts stated in the *OAA* pleadings themselves, which were open for public inspection. Moreover, Imperial's own attorneys' opinion as to the probable outcome was available to it. An erroneous or misleading opinion as to the outcome of a litigation, standing alone, is an insufficient predicate for invoking these affirmative defenses. *See Cristallina S.A. v. Christie, Manson & Woods*, 117 A.D.2d 284, 502 N.Y.S.2d 165 (1st Dep't 1986); *Banner v. Lyon & Healy, Inc.*, 249 A.D. 569, 293 N.Y.S. 236, *aff'd*, 277 N.Y. 570, 13 N.E.2d 774 (1st Dep't 1937). *Compare* Restatement Second, Torts, §§ 539, 525, Comment d. Such predictions are inherently uncertain given the hazardous nature of litigation and cannot be considered as the kind of misrepresentations that would make the contract voidable. Therefore, assuming the facts to be as Imperial has stated, they are, as a matter of law, insufficient to establish the invalidity or the voidability of the contract.[6]

### b. *Ownership*

■ The question of whether Topps misrepresented its ownership of the GPK trademark and copyrights might be one of fact not subject to a summary judgment were it not clearly stated in the agreement between the parties that "(i)n the event OAA is granted an injunction against Topps, all prepaid royalties shall be refunded . . . and this License shall cease." This provision clearly indicates that Imperial was fully aware of any uncertainty of Topps' title and of the immediate remedy available if its title were defective. In other words, as a matter of law, there could be no reliance on the part of Imperial or any misrepresentation of ownership on the part of Topps in view of the express injunction provision of the contract. Such alleged misrepresentation of ownership was therefore made immaterial by the insertion of the injunction clause into the contract.

### II. *Breach of Warranty*

■ The licensing agreement provided that Topps warrant and represent that it owned or controlled "the specified proprietary subject matter . . . and have the right to grant license rights to use thereof in the Territory [United States and Canada]". Topps has continuously maintained a registered trademark [Registration No. 1,359,512] and copyright registrations [VA 234670, VA 224450, VA 215843 and VA 227156] for Garbage Pail Kids, and Imperial has never disputed this fact. It is well settled that a registered trademark is *prima facie* evidence of the validity of such right. *See, e.g., Natures Bounty, Inc. v. SuperX Drugs Corp.*, 490 F.Supp. 50 (E.D. N.Y.1980). Nevertheless, Imperial has described the decision of the *OAA* court and the actions of the Customs Service as a breach of warranty of title and the denial

---

Topps in stating that the *OAA* decision would be rendered by June 1986, thereby inducing Imperial to enter into the agreement in May. This argument is entirely meritless; predictions as to the timetable of litigation are inherently hazardous at best.

**5.** The "cessation" of a license is automatic, while the "termination" of a license requires a voluntary act.

**6.** For similar reasons, Imperial's allegation of mutual mistake of fact as to the probable outcome of the Georgia action is of course also meritless.

of Topps' ability to license any GPK rights to Imperial. No court, however, has held that Topps does not own or have a proprietary interest in the GPK trademark and copyright registrations. Aside from this contention of Imperial, the indicia of Topps' title to the trademark and copyright registrations are clear. Both parties contemplated that the issuance of an injunction would be evidence of a breach but such an injunction was never issued.

## III. *Injunction*

There is no doubt that on August 2, 1986, the Georgia court did issue a "preliminary injunction" requiring the plaintiff to post a substantial bond. However, does the word "injunction" include a preliminary injunction that was never made effective? In *Neuman v. Pike*, 456 F.Supp. 1192, 1205 (S.D.N.Y.1978), *aff'd in part and rev'd in part*, 591 F.2d 191 (2d Cir.1979), the court described a "preliminary injunction" as follows:

> The judge's legal conclusions, like his fact-findings, are subject to change after a full hearing and the opportunity for more mature deliberation. For a preliminary injunction—as indicated by the numerous more or less synonymous adjectives used to label it—is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness.

The meaning of the word "injunction" is clear; it does not mean a preliminary injunction, particularly where no bond was ever posted. There is no need to resort to any outside evidence to determine either the meaning thereof or the parties' intent. *Levco Const. Corp. v. State*, 43 A.D.2d 759, 760, 350 N.Y.S.2d 219, 221 (3d Dep't. 1973). To interpret the word injunction otherwise would torture the meaning of the word. As explained in *Wards Co., Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir.1985):

[It] is the rare sentence that cannot be read in more than one way if the reader is willing either to suspend the rules of common English usage or ignore conventions of a given commercial setting. "*A court will not torture words to impart ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meaning.*" (Emphasis added.)

Here only a question of law is presented, that is, the interpretation of the words of the agreement, and summary judgment is proper on this issue. *See Long Island Rail Road Co., v. Northville Industries Corp.*, 41 N.Y.2d 455, 461, 393 N.Y.S.2d 925, 929, 362 N.E.2d 558, 562 (1977).

In connection with the Georgia decision, it is necessary to refer to the action of the Customs Service, since, in fact, the Customs Service predicated the prohibition of importation of the Imperial goods upon the *OAA* decision. The Customs Service is not a legal entity whose decisions can affect the valid title to either the GPK copyright or trademark, nor can its actions be equated to an injunction. Indeed, Imperial has already acknowledged this in its communications with the Service. (Affidavit of Jacobs in Opposition to Cross–Motion for Summary Judgment, Exhibit A). Moreover, the statements of Imperial's counsel to the Service to the effect that Topps had title and that there was no infringement of OAA's title, makes it now impossible for Imperial to claim that the Custom Service's bar was a breach of the agreement.[7]

### IV. *Substantial Frustration*

The reaction of the Customs Service to the Georgia court decision which barred imports of the GPK might be considered as a substantial frustration of the contract, thereby excusing Imperial from its obligations thereunder. This theory, though not advanced by Imperial, could only be of advantage to Imperial if there was a written understanding or condition at the be-

---

**7.** Even if one were to assume that the Georgia decision placed a cloud on the right Imperial received to use the GPK copyright and trademark, thereby constituting a breach of warranty of title on the part of Topps, the actions and declarations of Imperial described in our discussion of waiver, *infra*, clearly indicate that it had waived its right to place Topps in breach.

ginning of the contract or any time thereafter that Imperial was to obtain its products or materials solely from abroad. However, it is manifest that there was no such understanding or condition at any time and Imperial was free and entitled to obtain its products from domestic sources. Indeed, a rider to the contract specifically provided that Topps had veto power over "(m)anufacture or shipment (of GPK articles) from or to any country other than the United States or Canada ..." Therefore, it is difficult to see how the purpose of Imperial in entering into the agreement was substantially frustrated. The Restatement of Contracts § 265, Comments, lists the following factors that must be established to make out such a claim, thereby excusing performance on a contract: "First, ... the [object] that is frustrated ... must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, ... the frustration must be so severe that it is not fairly to be regarded as within the risks he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made ... so that it cannot be fulfilled without undue hardship ..." *Printing Industries Association v. Intern. Printing*, 584 F.Supp. 990, 1000 (N.D.Ohio 1984); *see also* 6 Corbin on Contracts § 1355 (1962).

In a word, the basis of the agreement was the right to use the GPK copyright and trademark in the United States and Canada. Each party assumed the risk of a binding injunction. The actions of the Customs Service based on the Georgia decision, even if they were legal, merely prevented the importation of GPK articles into the United States. Imperial at all times was fully capable of using domestic sources, either in the United States or in Canada, to produce these goods. Therefore, the only frustrating event which could have destroyed the value of the contract would

have been a final and binding decision that Topps did not hold valid title to the GPK copyright and trademark, thereby preventing any use whatsoever by Topps of the GPK. As we have already noted, there was never any such binding court decision to that effect. Thus, the salient factors to establish substantial frustration as set forth above are absent.[8]

### V. *Waiver*

Since it is often not clear that a party has waived its legal right(s), the waiver issue frequently involves questions of fact, and cannot be decided on a summary judgment motion. *Alsens A.P.C. Works v. Degnon Cont. Co.*, 222 N.Y. 34, 37, 118 N.E. 210 (1917). Nevertheless, "... (o)ccasionally it is proved by the express declaration of the party, or by (its) undisputed acts or language so inconsistent with (its) purpose to stand upon (its) rights as to leave no opportunity for a reasonable inference to the contrary. Then the waiver is established as a matter of law." *Id.* This is the situation in which Imperial finds itself.

Here, both parties have extensively briefed the question of whether Imperial waived and relinquished any right it may have had to terminate the agreement and to cease performing thereunder. Such discussion is immaterial since waiver is pertinent only if there were breaches of the agreement by Topps. Assuming there were such breaches, however, we conclude there was a waiver by Imperial. We believe the principle was well stated in *Specialities Development Corp. v. C–O–Two Fire Equipment Co.*, 207 F.2d 753 (3d Cir. 1953), *cert. denied*, 347 U.S. 919, 745 S.Ct. 519, 98 L.Ed. 1074 (1954) where the court said that:

We do not find anything in this or any other New York case which we have located to throw doubt upon the general proposition that *one against whom a material breach is committed must*

---

8. In addition, Imperial might have raised the defense of anticipatory breach of the agreement, although it did not do so. The mere fact of the *OAA* decision might have created a reasonable uncertainty as to the validity of the agreement, thereby entitling Imperial to demand assurances from Topps. *Cf.* U.C.C. § 2–609 [sale of goods]. Imperial made no such demand, however, instead maintaining to the Customs Service that Topps held valid title to the GPK copyright and trademark and was therefore innocent of any infringement.

*make up his mind what he is going to do about it, and that if he goes ahead without performance he is not excused from liability under the terms of the contract.* (Emphasis added.)

*See also Plastic Contact Lens Co. v. Frontier of Northeast, Inc.,* 324 F.Supp. 213 (W.D.N.Y.1969), *aff'd,* 441 F.2d 67 (2d Cir. 1971), *cert. den.,* 404 U.S. 881, 92 S.Ct. 196, 30 L.Ed.2d 162 (1971). A party to a contract surrenders its right to claim that the contract was terminated by the other party's breach when it chooses nevertheless to perform the contract. *Universal City Studios, Inc. v. Nintendo Co. Ltd.,* 615 F.Supp. 838 (S.D.N.Y.1985).

■ Imperial contends that it waived no claims for breach of contract but simply continued its performance in order to mitigate damages after the Georgia decision and the bar of the Customs Service. The undisputed facts nevertheless show that: (1) Imperial proclaimed to the Customs Service that, in effect, there had been no breach by Topps; (2) after the Georgia decision Imperial continued to enjoy the use of the right of the GPK license by selling over $300,000 worth of licensed articles; and (3) the excuse offered by Imperial that it was mitigating damages in selling after the Georgia decision was distinctly unauthorized by the provision of the agreement which stated that:

> On expiration or termination hereof, all royalties are immediately due and payable, and *[Imperial] shall immediately stop manufacture, sale and distribution of all articles licensed and send [Topps] a complete inventory report and accounting with payment due within 30 days* ... (emphasis added)

This provision cannot now be ignored under the excuse of mitigation of damages.

Finally, in its letter of October 30, 1986, Imperial clearly demonstrated to Topps that it did not view the Georgia preliminary injunction decision as the type of injunction referred to in the contract. Rather, Imperial merely stated that "the outcome (of the *OAA* matter) is still in doubt", and that it was not prepared to pay royalties until the "problems" caused thereby would be re-solved by the subsequent trial concerning the injunction. In other words, Imperial had made up its mind to go ahead with the agreement.

## VI. *The Ogden Affidavit*

■ A word is in order about Ogden's last-minute affidavit. It is for the Court alone to make the final decision as to whether or not the licensing agreement is enforceable. The Ogden affidavit is nothing more than an opinion containing the conclusions of law of an alleged attorney expert. The affidavit does not meet the requirements of Fed.R.Civ.P. 56(e) in that it is not made on personal knowledge and, in addition, it does not cover a proper area for expert testimony. *See F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250 (2d Cir.1987) (not for witnesses to instruct jury as to applicable principles of law, but for judge). "The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case (is expert testimony permitted)". *Marx & Co., Inc. v. Diners' Club, Inc.,* 550 F.2d 505, 510 (2d Cir.1977), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed. 2d 134 (1977).

## *Conclusion*

For all of the foregoing reasons, summary judgment is granted in favor of Topps on the issue of liability on its first and second causes of action. Imperial's counterclaims are accordingly dismissed and Imperial's cross-motion for summary judgment on its counterclaims is denied. The case shall be continued for determination of damages and of the remaining causes of action.

SO ORDERED.