In the Matter of Claims in Connection With the Buffalo Schools Renovation Program.


2016-800900

HARTER SECREST & EMERY LLP
Carol E. Heckman, Esq., Of Counsel
Daniel J. Altieri, Esq., Of Counsel
Attorneys for City of Buffalo City
School District and City of Buffalo
Joint Schools Construction Board
HODGSON RUSS LLP
Daniel C. Oliverio, Esq., Of Counsel
Benjamin M. Zuffranieri, Esq., Of Counsel
Terrence M. Gilbride, Esq., Of Counsel
Timothy W. Hoover, Esq., Of Counsel
Aaron M. Saykin, Esq., Of Counsel
Attorneys for LPCiminelli, Inc.


Timothy J. Walker, J.

This action is a consolidation of an action commenced by the City of Buffalo City School District ("District") against LPCiminelli, Inc. ("LPC"), and an action by LPC against the City of Buffalo Joint Schools Construction Board ("JSCB")[FN1]
and the District. 
In this matter, LPC has applied, pursuant to CPLR § 3211, to dismiss the District's Complaint, dated January 29, 2016, and the District and the JSCB have applied, pursuant to CPLR §§ 3211 and § 3813 of the New York Education Law, to dismiss LPC's Verified Petition and Complaint, dated February 17, 2016, and by way of cross-motion to direct LPC to preserve any documentation related to the construction program at issue in the consolidated action. This Court (by decision rendered on the record on August 15, 2016) disposed of some, but not all aspects of the dueling applications. Instead, it invited further submissions (which the Court has now reviewed, and considered), and now disposes of the remaining aspects of the applications.
This action arises out of LPC's role as the "Program Provider" for the renovation of 48 schools for the District, formerly known as the Buffalo Schools Renovation Program (the "Program").
The general framework of the Program was governed by a Comprehensive Program Packaging and Development Services Provider Agreement, signed by the JSCB and LPC in 2002 ("PPDSA"). It is undisputed that the JSCB acted as the District's agent in implementing and overseeing the Program.
Pursuant to the PPDSA, the Program was implemented over five (5) phases, and each phase was governed by separate phase agreements (the "Phase Agreements"). The Phase Agreements set out the delivery model for the phase and the specific schools to be renovated pursuant to that delivery model. 
While substantially all of the Program was financed with state funds (not the District's or the City's), the District, the JSCB, and the bond insurers and underwriters insisted that LPC agree to commit to fixed-priced construction agreements for each phase of the renovations, pursuant to which LPC assumed virtually all of the risk of cost overruns and time delays. The Phase Agreements required that amounts due LPC were to be determined by the Program's architects, based upon the percentage of completion of the stipulated sum, not the actual cost of construction and administration. 
For more than a decade (and five phases of the Program) the JSCB approved and paid 265 of LPC's Program payment requisitions, without reservation - until late 2014.[FN2]
At that time (and at the behest of certain members of the District's Board of Education), the JSCB failed to process certain of LPC's payment requisitions for completed portions of the Program, totaling in excess of $3.1 million (the "Disputed Payment Requisitions"), and the District insisted that it - not the JSCB, was solely responsible for considering them. For the first time, the JSCB and the District demanded that LPC produce documentation of, inter alia, LPC's Program-related overhead and administration costs, construction expenses and profit (the "Disputed Information"). STANDARD OF REVIEW
It is well settled that, on a motion to dismiss pursuant to CPLR §3211, the complaint shall be liberally construed (see CPLR §3026), and the court shall accept the facts, as alleged in the complaint, as true, and afford the plaintiff the benefit of every favorable inference (Leon v. Martinez, 84 NY2d 83 [1994]). Moreover, the court shall avoid assessing the merits of the complaint or any of its factual allegations and instead determine only whether the facts as alleged fit within any cognizable legal theory (Id.). 
It is equally well settled that allegations lacking factual support need not be accepted as true (Dominski v. Frank Williams and Son, LLC, 46 AD3d 1443 [4th Dept. 2007]).
ANALYSIS AND DETERMINATIONS
Preliminary Matters
Condition Precedent
LPC contends that the District's Complaint should be dismissed, because the District failed to comply with a condition precedent to commencing this action. 
Section 18.01(a) of the PPDSA defines "default" as follows:
The failure by any party (the "Defaulting party") to perform, keep or fulfill any of the terms, covenants, undertakings, obligations, or conditions set forth in this Agreement or an Addendum . . . and the continuance of such failure for a period of thirty (30) days after receipt by the Defaulting party of notice thereof from another party hereto (the "Non-Defaulting Party") specifying such failure . . . .
It is undisputed that, on January 28, 2016, the District sent LPC a notice of default, pursuant to § 18.01(a) of the PPDSA (the "Notice of Default"), and that, on the next day - January 29, 2016, the District commenced its action, thus failing to provide LPC with the requisite thirty (30) day cure period (assuming the Notice of Default was timely).[FN3]

The District contends that it sent LPC the Notice of Default for the "sole" purpose of "allow[ing] the District to foreclose upon its security interest in Program-related documents . . . ." However, this contention is at odds with the Notice of Default, itself, which plainly provides as follows:
[P]lease let this serve as formal notice pursuant to Section 18.01(a) of the [PPDSA] that [LPC] is in default of its contractual obligations under the [PPDSA and related documents] (emphasis added).
A plaintiff's failure to provide a defendant with a contractually-prescribed period to cure a default renders the summons and complaint a nullity, as premature (ACE Sec. Corp. v. DB Structured Prods., Inc., 25 NY3d 581 [2015]). However, it is equally well-settled that where, as here, the party relying on the opportunity to cure has received actual notice of its alleged breach, strict compliance with a contractual notice provision is not required if such party is not prejudiced by the lack of contractual notice (Suarez v. Ingalls, 282 AD2d 599 [2d Dept 2001]).
It is undisputed that LPC and the District had been at odds over whether LPC should be required to produce the Disputed Information for in excess of one (1) year prior to the commencement of the District's action, and LPC has neither claimed, nor demonstrated that it was prejudiced by the District's failure to strictly comply with § 18.01(a) of the PPDSA.
In addition, PPDSA § 23.01 contains an express condition precedent to commencing an action. It provides, in relevant part, that
[e]ngaging in mediation is a condition precedent to any further action by any party to resolve any [*2]dispute or to enforce any right under this Agreement.
LPC's contention that the District did not participate in mediation is inconsistent with the District's Complaint, which alleges, inter alia, that on April 27, 2015, LPC initiated mediation with respect to the Disputed Payment Requisitions (Complaint, ¶67); the mediation proceeding was held on September 9, 2015 (Id., at ¶69); and the parties were unable to resolve their dispute at the mediation, which was then terminated (Id., at ¶70). Accepting these facts as true (Martinez, 84 NY2d at 87), the Court rejects LPC's contention that the District did not participate in pre-suit mediation.
The Court also rejects LPC's contention that the September 9, 2015 mediation failed to satisfy a pre-condition to suit, because LPC initiated the mediation over its claims against the District, as opposed to the District having initiated the mediation to address the District's claims against LPC. LPC's claims against the District (and the JSCB) are inextricably linked to the District's claims against LPC concerning the Disputed Information. Stated differently, it would be impossible to mediate LPC's claims for non-payment (which underlie its claims) without addressing the District's claim that LPC failed to provide the Disputed Information, which serves as the basis for the District's refusal to pay the Disputed Pay Requisitions.
For the foregoing reasons, the District has not failed to satisfy a condition precedent to having commenced its action (nor has LPC).
Statute of Limitations
In its Verified Petition and Complaint, LPC alleges that, inter alia, the District and/or the JSCB have refused to process the Disputed Payment Requisitions, which consist of four (4) separately numbered applications (56, 57, 67R and 68) that collectively total $3.1 million. The District contends that LPC's Verified Petition and Complaint should be dismissed, because the claims are time-barred. 
It is well settled that under Education Law §3813(1), "a notice of claim must be served upon a school district within three months after the accrual of the claim." Moreover, where, as here, the "action or special proceeding [is] for monies due arising out of a contract, accrual of such claim shall be deemed to have occurred as of the date payment for the amount claimed was denied" (Id.). 
On October 31, 2014, LPC submitted applications 56 and 67R to Joseph Giusiana (the District's Executive Director of Plant Services), for the JSCB's consideration at its meeting scheduled for November 3, 2014. 
The District contends that, at such meeting, applications 56 and 67R were formally denied, because three (3) board members voted to disapprove them, while two (2) members voted to approve them. However, three votes are insufficient for the JSCB to take any action (see City Charter § 18-59[d] [requiring a majority of four (4) votes of the six (6) member board to take any action]).
Moreover, the minutes of the JSCB's November 3, 2014 meeting ("Minutes") reflect that, at the conclusion of the meeting, JSCB board member Quinn "made a motion to reconsider Pay Applications 67R and 56 at a later date once [LPC] provides the supporting details on the above pay applications . . . ." The Minutes further reflect that the motion was "[s]econded . . . [u]nopposed . . . [and] approved."
Under these circumstances, Pay Applications 56 and 67R were not definitively denied, within the meaning of the accrual provisions of Education Law §3813(1).
On December 29, 2014, LPC submitted all of the Disputed Payment Requisitions to Mr. Giusiana, for the JSCB's consideration at its meeting scheduled for January 12, 2015. They were neither approved, nor denied, because no vote was taken.
On May 12, 2015, the District notified LPC by letter that only it - not the JSCB, could approve or disapprove the Disputed Payment Requisitions under the applicable Phase Agreements, insisted that the JSCB lacked the authority to approve them, and notified LPC that the District refused to process them until LPC provided it with the Disputed Information ("May 12, 2015 Letter").
By the fall of 2015, with the JSCB having failed to act (one way or the other) on the Disputed Payment Requisitions considered at its January 12, 2015 meeting, LPC withdrew them from the JSCB and submitted them to the District. In response, the District (by Mr. Giusiana) advised LPC on December 15, 2015 that the District objected to LPC's submission of the Disputed Payment Requisitions. Mr. Giusiana stated further that the District would not process them until LPC provided it with the Disputed Information.
The District contends that LPC's claims related to the Disputed Payment Requisitions are time-barred, because LPC did not serve a notice of claim on it within three (3) months of January 12, 2015, at which time the District contends it had denied payment of the claims. The District's contention is misplaced for two (2) reasons. First, as previously shown, as of January 12, 2015, the Disputed Payment Requisitions were before the JSCB - not the District [FN4]
, and neither the JSCB, nor the District had definitively denied payment of them. Rather, the JSCB failed to take any action. Second, by insisting that only the District could approve the Disputed Payment Requisitions (see the District's May 12, 2015 Letter), the District effectively voided (ab initio) all previous actions between LPC and the JSCB relative to them.
In light of the foregoing, LPC's claims against the District relative to the Disputed Payment Requisitions accrued (at the latest) on December 15, 2015, when the District notified LPC that it refused to process them until LPC provided it with the Disputed Information. Accordingly, LPC's Amended Notice of Claim, served on the District on January 5, 2016, is timely pursuant to Education Law § 3813(1).
The District's Second and Third Causes of Action (Breach of Contract)
PPDSA § 11.05(k)

The District's Second Cause of Action is premised on LPC's alleged breach of PPDSA§ 11.05(k), which provides, in relevant part:
With respect to the construction phase of any Project, it shall be [LPC's] obligation to:
. . . (k) Provide regular comparisons of the approved construction cost estimates with actual costs and submit monthly reports to the JSCB that identify variances between actual and [*3]estimated costs[the "Cost Variance Reports"] . . . [emphasis added].
The District alleges that LPC violated PPDSA § 11.05(k) by
fail[ing] to provide any such comparisons or [Cost Variance Reports] throughout the duration of the Program and, upon information and belief, did so in furtherance of its scheme to conceal the gross profits it was unlawfully pocketing during each Phase of the Program (Complaint, ¶84) (emphasis added).[FN5]

The Court is aware of the fundamental principle of construction law that, under a fixed-price, stipulated sum contract,
[t]he contractor receives one fixed price for performing the work no matter how costly it is to perform . . . . If the work is less expensive than anticipated by the contractor, the contractor reaps all of that profit. If the work is more expensive than anticipated, that too is the contractor's sole risk (Brunner & O'Connor On Construction Law, § 6.71, 621-22 [2002]).
New York law is settled that "the parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties'" (Federal Ins. Co. v. Americas Ins. Co., 258 AD2d 39, 44 [1st Dept 1999], quoting Webster's Red Seal Publs. v Gilberton World-Wide Publs., 67 AD2d 339, 341 [1st Dept 1979], affd, 53 NY2d 643 [1981]). "[T]he practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." (Id.) [emphasis added]; see also, IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp., 26 F3d 370, 374 [2d Cir 1994]; Matter of Carol B. v. Sanford B., 54 AD3d 653, 654 [1st Dept 2008] [acceptance of payments for 17 years without objection]). Such evidence may be considered on a CPLR § 3211(a)(1) motion to dismiss where it confirms the "plain language of the agreement" or "utterly refutes" the plaintiff's claims (Ellington v. Emi Mills Music, Inc., 2011 NY Misc LEXIS 6631, at *6-8, 11 [Sup Ct NY Co 2011]; see also TDD Irrevocable Trust v. J & A Saporta Realty Corp., 139 AD3d 706, 707 [2nd Dept 2016]). 
Here, the parties' course of performance confirms that the plain language of PPDSA
§ 11.05(k) - which requires LPC to provide monthly reports enabling the JSCB to see any variance between "approved construction cost estimates" and "actual costs"- pertains to the District's actual construction costs, not LPC's construction costs. Under the parties' fixed-price contract, the only relevant "actual cost" is the cost to the owner(i.e., the stipulated sum), not the cost to the design-builder. By accepting, certifying, and paying 265 consecutive payment applications over the course of twelve (12) years (including closing out three (3) separate Phases), the District conceded this interpretation of the PPDSA, as well as LPC's compliance with it. In particular, LPC's monthly payment applications included a schedule of costs (divided into "Construction Costs" and "Incidental Costs"), paid to LPC as a percentage of the work [*4]completed on each Phase. The approved schedule of values (which the District had signed and certified) represented the District's actual Construction Costs. The Construction Costs could be compared with the Approved Construction Cost Estimates.
From 2002 until October 2014, neither the District, nor the JSCB sought to review LPC's actual Construction Costs pursuant to § 11.05(k), nor did they claim to interpret this provision in a manner inconsistent with the parties' decade-plus course of performance (see, e.g., District's Complaint, ¶ 85). Nor did the District or the JSCB ever claim that "Construction Costs" meant "Project Costs" (which is defined as the sum of Construction Costs and Project Administrative Costs) (see Phase V Agreement, § 2.37). Rather, by approving 265 consecutive pay applications that defined Construction Costs as the District's (not LPC's) actual costs in the schedule of values, the District confirmed this interpretation. 
The first time the JSCB claimed § 11.05(k) permitted it to review anything other than its own actual Construction Costs was October 2014, more than twelve (12) years after the Program's inception (see, e.g., Giusiana Aff., ¶ 6, Ex. B).
The parties' acknowledged interpretation of §11.05(k) is further confirmed by § 6.8 of Phase Agreements, pursuant to which the District was expressly prohibited from examining LPC's Construction Costs and Project Administrative Costs (which are defined terms) except with regard to the expenditure of the "construction contingency" (Id.). There would have been no need for such a provision, permitting this limited examination, if the District was already allowed to do so pursuant to § 11.05(k) (and § 15.01[c]), as it now claims. 
PPDSA § 15.01(c)
The District contends that PPDSA § 15.01(c) requires LPC to provide it with
"everything," including "a breakdown of [LPC's] actual incidental or administrative costs" (Transcript of Aug. 15, 2016 oral argument ("Transcript"), at 12). This interpretation is refuted by the plain language of § 15.01(c); and is contrary to the parties' course of performance. 
Section 15.01(c) provides the JSCB with "access to all documentation and information concerning any Project relating to the bidding, letting, and payment of contracts. . . ." (emphasis added). It is silent as to LPC's "incidental" or Project Administrative Costs. The only contracts that are "bid, let, and paid" are those relating to subcontractor Construction Work (i.e., Construction Costs), limiting § 15.01(c) to documents related to such work. 
Section 15.01(c) does not include LPC's "Program Management", or Program "Administrative Costs," - which are not bid and let - but which the District now demands pursuant to its interpretation of 15.01(c) (see Giusiana Aff. ¶¶ 6, 9; Phase V Agreement §§ 2.11, 2.15, 2.36-2.41). The intended scope of this provision is confirmed by § 6.8 of the Phase Agreements, which explicitly limits any examination of LPC's Project Administrative Costs (and profits related thereto) to those associated with the expenditure of the "construction contingency." Again, they would have been no need for such a provision, permitting this limited examination, if the District were already allowed to do so pursuant to § 15.01(c).
Prior to October 2014, neither the District, nor the JSCB requested LPC's incidental or Project Administrative Costs pursuant to § 15.01(c), nor did either claim that such a right existed (see Dist. Compl. ¶ 91; Transcript at 16). Nor did the District or the JSCB claim that "bidding, letting, and payment" of subcontracts included LPC's own Project Administrative Costs (see Id.). [*5] Rather, for twelve (12) years (and without objection), LPC - in satisfaction of this provision - regularly provided information regarding its "bid and let" subcontracts and associated costs, including relevant change order information, to the District's independent compliance monitors. This course of conduct confirms that the audit rights under § 15.01(c) are limited to subcontractor Construction Costs that are bid and let, and "utterly refutes" the District's post hoc interpretation raised at Program completion (Ellington, 2011 NY Misc. LEXIS 6631, at *6-8, 11-12; TDD Irrevocable Trust, 139 AD3d at 707). 
Waiver
Assuming, arguendo, the District had a contractual right to examine LPC's Construction Costs and Program Administrative Costs (beyond expenditures related to the construction contingency), the District waived it by continuing to approve, and pay for LPC's work for twelve (12) years without objection. Moreover, the District is estopped from claiming, at Program completion, that such a right existed after acknowledging the correctness of a contrary position for more than a decade. 
A party's "continued acceptance of performance following what is now alleged to constitute a breach is tantamount to a waiver of its right to recover damages for the alleged breach." (Universal City Studios, Inc. v. Nintendo Co., 615 F Supp. 838, 861 [SDNY 1985]). Waiver may occur "by words or conduct, including partial performance" regardless of whether (as here) there is "a provision to the contrary in the agreement" (Madison Ave. Leasehold, LLC v. Madison Bentley Assoc., LLC, 30 AD3d 1, 5-6 [1st Dept 2006] (quoting Bank Leumi Trust Co. v. Block 3102 Corp., 180 AD2d 588, 590 [1st Dept 1992]); PPDSA § 24.01 [no waiver clause]). Once an owner has "accepted the improvements constructed under the contract and paid for them," he has waived the right to recover for construction damages (except for latent defects) (Tonawanda v. Stapell, 240 AD 472, 474 [4th Dept 1934], affd, 265 NY 630 [1934]; see also Yeshiva University v. Fidelity & Deposit Co., 116 AD2d 49, 52 [1st Dept 1986]). Although waiver is more frequently an issue of fact, "'. . . (o)ccasionally it is proved by the express declaration of the party, or by (its) undisputed acts or language so inconsistent with (its) purpose to stand upon (its) rights as to leave no opportunity for a reasonable inference to the contrary. Then the waiver is established as a matter of law'" (Topps Chewing Gum, Inc. v. Imperial Toy Corp., 686 F. Supp. 402, 408 [EDNY 1988] (quoting Alsens A.P.C. Works v. Degnon Cont. Co., 222 NY 34, 37-38 [1917]). 
Here, the District admits conduct demonstrating waiver as a matter of law. It acknowledges that the JSCB first requested to examine LPC's Construction Costs and Project Administrative Costs in October 2014 (Dist. Compl. ¶¶ 85, 91; Transcript at 16). By then, the District had accepted the work for, certified, and paid 265 consecutive LPC payment applications spanning a 12-year period (LPC Ver. Compl. ¶¶ 21-23, 25). The District further admits that, at the time of the JSCB's first request in October 2014, Program Phases I, II, and IV were already completed and closed (Dist. Compl. ¶¶ 21, 22, 24), and that Phases III and V were near completion (Id. ¶¶ 23, 25). Moreover, the District does not dispute that it accepted the Program work related to LPC's remaining outstanding payment applications (56, 57, 67R, and 68), and has been using the schools for nearly two years. Simply put, the District waived any right to sue for damages related to Program work (Tonawanda, 240 A.D. at 474). 
Equally important, the District is estopped from taking a position contrary to that which it [*6]established over a period of twelve (12) years, uninterrupted, and upon which LPC reasonably relied. Under New York law, "[a]n estoppel may arise against a municipality the same as against any other party" (Vermeule v. Corning, 186 AD 206, 209 [4th Dept 1919], affd, 230 NY 585 [1920]; see also Planet Constr. Corp. v. Board of Education, 7 NY2d 381, 385 [1960]). It applies where the "governmental subdivision acts or comports itself wrongfully. . . inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice . . ." (Bender v. New York City Health & Hospitals Corp., 38 NY2d 662, 668 [1976]; see also La Porto v. Philmont, 39 NY2d 7, 12 [1976] [municipality cannot change its position after a multi-decade "posture of silence"]; E. Coast Res., LLC v. Town of Hempstead, 707 FSupp 2d 401, 407-408 [EDNY 2010] [estoppel applies to service of a notice of claim]). 
Here, the District's estoppel arises from its twelve (12) years of consistently acknowledging that LPC satisfied its contractual obligations, as understood by the parties, under PPDSA §§ 11.05(k) and 15.01(c). Tellingly, the District does not allege that it, or the JSCB disputed LPC's compliance with these provisions until October, 2014, when three (3) of five (5) Phases were closed, and the Program was essentially at completion.
Further, the District's change in position is to the detriment of LPC. It would be highly prejudicial, costly, and unfair to require LPC to provide an unanticipated accounting years after LPC's performance of its contractual obligations. On the basis of its new interpretation, the District is withholding $3.1 million in payments due to LPC for completed work that the District has approved, accepted, and utilized. Additionally, the District has demanded that LPC produce virtually every document related to the Program since inception.
Materiality
The District's claim that LPC failed to provide required information, even if accepted as true, fails to set out a material breach of contract as a matter of law and, in any event, cannot justify the District's refusal to pay LPC for the work approved and accepted. 
Only a "material" breach of contract gives rise to a cause of action or a right to rescind. (Accadia Site Contracting, Inc. v. Erie Cnty. Water Auth., 115 AD3d 1351, 1353 [4th Dept 2014]). A "material breach is generally regarded as a breach which 'substantially defeats' the purpose of an agreement in such a fundamental way as to 'defeat the object of the parties in making the contract', and otherwise occurs where a party fails to perform a substantial part of the agreement . . . performance of which was the initial inducement for entering the agreement . . ." (Awards.com v. Kinko's, Inc., No. 603105/03, 2006 WL 6544391, at *5 [Sup Ct NY Cnty 2006] quoting Callanan v Powers, 199 NY 268, 284 [1910], affd as modified, 42 AD3d 178 [3rd Dept 2007]). For a breach to be material, it "must go to the root of the agreement between the parties" (Frank Felix Assocs. v. Austin Drugs, Inc., 111 F3d 284, 289 [2d Cir. 1997], as corrected in, 1997 U.S. App. LEXIS 19795, at *14 [internal quotation marks omitted]). 
A party to a contract will not be excused from paying for the other party's services absent such material breach (Wolfson v. Farci Lange LLP, 103 AD3d 1272, 1273 [4th Dept 2013]). In determining whether a breach is material, "courts generally consider the extent to which the non-breaching party will be prejudiced or damaged by lack of full performance" (Awards.com, 2006 WL 6544391, at *5-6; accord Frank Felix Assocs., Ltd., 1997 U.S. App. LEXIS 19795, at [*7]*15, citing Restatement (Second) of Contracts § 241[a]). Whether a breach is material is "a question of law to be decided by the Court" (Lafarge Bldg. Mats., Inc. v. Pozament Corp., 28 Misc 3d 1228(A), 2010 WL 3398537, at *10 [Sup Ct Albany Co 2010]). 
Lafarge is instructive. There, the plant operator contracted with a supplier to receive flyash for recycling, and a term of the agreement required the operator to provide the supplier with regular fly ash consumption forecasts (Id. at *1). Delivery commenced, and the operator never provided the reports. The court held that the operator's alleged breach was not material, because the supplier was well aware of the increasing amounts of fly ash needed by the operator (Id. at *7). The supplier's personnel were in constant communication with the operator's personnel, and the operator never raised any objection or demanded the reports, during the term of the agreement while the work was performed (Id. at *8). 
Here, any alleged breach by LPC's purported failure to provide certain information was not material. The purpose of the Program and its contracts was to renovate forty-eight (48) District schools for a stipulated sum. That purpose was fully accomplished. The District does not dispute this. It accepted the work, occupied the buildings, and received the certifications of the Architects of Record, who signed off on the outstanding payment applications (LPC Compl. ¶ 54; Transcript at 43-44). For twelve (12) years, the District never claimed that LPC failed to provide it with regular reports or required information. The District's claim, raised at Program completion, does not go to the "root" of the contracts; it was not so substantial that it defeated the object of the parties in making the contracts; and, equally important, the provision of information was never an inducement for the District to enter into the contracts at issue. The District wanted schools renovated, at a fixed priced, and that is what it received. Under a fixed-price contract, the actual cost to the design-builder is irrelevant and immaterial. The provision that the District relies most heavily on - PPDSA § 11.05 - predates the entry of the Phase Agreements, meaning it had even less materiality once the fixed-price model was agreed on (Transcript at 85-86). 
Further, the District's reliance on Tsimerman v. Janoff (40 AD3d 242 [1st Dept 2007]), is misplaced. The briefings in Tsimerman confirm what the Court addressed previously at oral argument: that Tsimerman involved a law firm defending a client in a criminal matter on an hourly basis, such that the law firm's agreement to provide monthly billing statements was relevant and material to the fees being paid for such hourly work (see, e.g., Brief for Plaintiffs-Respondents in Tsimerman v. Janoff , 2007 WL 3028514, at *7 [1st Dept]; [Transcript at 32-33]). It was not a contingency fee case, which is analogous to a fixed-price construction contract. 
Moreover, the failure to provide, or delay providing billing statements for services rendered is not automatically a material breach (Wolfson, 103 AD3d at 1273). The present case does not resemble other cases, in the insurance context, where the insured is required to provide regular information to his insurance company to determine whether a claim is covered and will be paid (Rosetti v. United States Fidelity & Guar. Co., Inc., 219 AD2d 819, 819 [4th Dept 1995]).This determination is further confirmed by the absence of any alleged cognizable damages. The District has not suffered any harm or loss, let alone monetary loss, from the alleged failure to provide the requested information. Its alleged damages are grounded in a speculative and retrospective rewrite of the history of the parties' relationship: that if the District had access to LCP's profit and cost information, it may possibly have made different decisions [*8]about where funds were spent within the Project, or would not have entered into subsequent Phase Agreements (Transcript at 33-34; Dist Compl ¶ 52). This is not a proper basis for contract damages, because the contract price would have remained exactly the same (Kenford Co., Inc. v. Cnty. of Erie, 108 AD2d 132, 135 [4th Dep't 1985], rev'd in part on other grounds, 73 NY2d 312 [1989]). 
The District's Sixth Cause of Action (Declaratory and Injunctive Relief)
Here, the District alleges that it has a security interest in "all contracts and other documents relating to the Program" (Complaint, ¶115). The claim is based on § 11.3 of the Phase II Agreement, and § 13.4 of the Phase III, IV, and V Agreements, which permit the District to exercise its rights to certain materials "only after an event of default . . . has occurred and is continuing after the expiration of all applicable cure periods."
Having determined that LPC did not breach the PPDSA, LPC has not committed "an event of default." Accordingly, the District's Sixth Cause of Action is dismissed, as moot.
The District's Seventh Cause of Action (Declaratory and Injunctive Relief)
The Seventh Cause of Action is premised, in part, on the Second and Third Causes of Action, both of which are grounded in alleged breaches of the PPDSA. Here the District seeks "declaratory and injunctive relief requiring [LPC] to produce all Program information sought by the District and currently withheld by the Defendant." 
Having granted LPC's motion to dismiss the District's Second and Third Causes of Action, the motion to dismiss the Seventh Cause of Action is granted for the same reasons. 
LPC's Article 78 Cause of Action for Mandamus
LPC has asserted a claim against the District and the JSCB, pursuant to CPLR Article 78, sounding in mandamus, to compel one or both of them to act on the Disputed Payment Requisitions by either approving or rejecting them. 
Pursuant to CPLR § 7803, a party may bring a claim for mandamus to compel performance of a ministerial duty "where there is a clear legal right to the relief sought" (Klostermann v. Cuomo, 61 NY2d 525, 539 [1984]). 
In New York, public entities, such as the District and the JSCB, have an "absolute" obligation to act on submissions and applications - like the Disputed Payment Requisitions, and to issue a definitive determination within a reasonable time (Ista Mgmt. Co. v. State Div. of Hous. & Cmty. Renewal, 139 Misc 2d 1, 4 [Sup Ct NY Co 1988]). 
The District and the JSCB confuse a ministerial duty to act on the Disputed Payment Requisitions with their discretionary process to reach a particular decision. The issue was precisely framed by the Ista court, as follows:
The issue is overwhelming in its simplicity: Is the obligation to render a determination a ministerial duty? The agency characterizes it as discretionary, judgmental and therefore nonministerial. It is readily apparent, however, that [the agency] is confusing the nature of the act prescribed with the process necessary to its performance. A matter submitted for determination, whether to an administrative agency or a court, imposes a clear duty to render a decision. The obligation to issue the determination is absolute and therefore ministerial. It is only the process by which the decision is reached which is judgmental. Therefore the failure to perform the duty to render a determination within a reasonable time is grounds for mandamus to compel (Id. [emphasis added]; see also, Klostermann, 61 NY2d at 540 [mandamus lies against [*9]municipal officer to compel him perform a legal duty, and not to direct how he shall perform it]; Matter of Level 3 Communications, LLC v. Erie County, 132 AD3d 1271, 1274 [4th Dept 2015 [petition granted "insofar as it sought to compel the City of Buffalo and the Lackawanna School District to determine petitioner's applications] citing Klostermann). 
The District's Cross-Motion
The District's cross-motion for a preservation order appears reasonable under the circumstances presented. 
In light of the foregoing, it is hereby
ORDERED, that LPC's motion to dismiss the Complaint is granted, in part, as follows: the District's Second, Third, Sixth, and Seventh Causes of Action are hereby dismissed; and it is further
ORDERED, that the District's cross- motion requiring LPC to preserve all Program-related documents is granted; and it is further
ORDERED, that the District's motion to dismiss LPC's claims as untimely is denied; and it is further
ORDERED, that the District's motion to dismiss LPC's Article 78 Cause of Action is denied; and it is further
ORDERED, that the Petition is granted and the District shall act on the Disputed Payment Requisitions by either definitively approving or rejecting them.
This constitutes the Decision and Order of this Court. Submission of an order by the Parties is not necessary. The delivery of a copy of this Decision and Order by this Court shall not constitute notice of entry.
Dated: December 8, 2016
Buffalo, New York
____________________________________
HON. TIMOTHY J. WALKER, J.C.C.
Acting Supreme Court Justice
Presiding Justice, Commercial Division
8th Judicial District



Footnotes

Footnote 1:In 1998, the City of Buffalo (the "City") and the District established the JSCB to, inter alia, "meet the demands and needs of the Buffalo Public School System . . ." (Complaint, §7).

Footnote 2:Importantly, four (4) dozen city schools were refurbished and certified by the Program's architects, the District and the JSCB as properly completed. Additionally, the primary source of funding (the New York State Education Department ["NYSED"]) also certified completion, thereby allowing payments to be made.

Footnote 3:The five (5) individual Phase Agreements were executed between September 1, 2003 and December 1, 2009 (Complaint, ¶¶21-25). The District did not make a request for the Disputed Information until late 2014, many years after each of the Phase Agreements had been executed, and the vast majority of the construction work had been completed by LPC and accepted (and/or paid) by the District/NYSED.

Footnote 4:The Court rejects the District's contention that LPC's submission of the Disputed Payment Requisitions to Mr. Giusiana constituted submission to the District, not the JSCB, because upon receiving them, Mr. Giusiana submitted them directly to the JSCB for its exclusive consideration.

Footnote 5:Notwithstanding this blanket allegation, the District's submission on the motion concedes that LPC provided it with some of the Disputed Information regarding construction-related information for Phase II of the Program (see spreadsheet attached as Ex. I to the Affidavit of Joseph Giusiana, sworn to on April 15, 2016) ("Giusiana Aff.").